# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
### CASE NO. 21CV20019

Oleg Zhukovskiy

     Plaintiff,

v.

National Bank of Ukraine

     Defendants,

FILED BY _____ D.C.

JAN 27 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## CLERK'S NOTICE OF  INTERNATIONAL SERVICES

In accordance with Federal Rules of Civil Procedure Rule 4, and/or 28 U.S.C. § 1608(a)(3) or (b)(3)(B), the Clerk certifies that on this 27th day of January 2021, (*summons and complaint*) have been mailed via International Service to:

Defendant: National Bank of Ukraine
St. Institutskaya, 9
Kyiv-8, 01601, Ukraine

Country: Ukraine

Article number:  804296711532

DONE at the Federal Courthouse Square, Miami, Florida, this 4th day of November, 2014.

ANGELA E. NOBLE
Court Administrator • Clerk of Court

By:

Deputy Clerk

c:    U.S. District Judge
      All counsel of record

RETAIN THIS COPY FOR YOUR RECORDS.

**FedEx Express** — International Air Waybill

1 From *Please print and press hard.*

Date 1/27/21

Sender's FedEx Account Number 3868830347

Sender's Name CLERK OF COURTS

Phone

Company WILKIE D. FERGUSON, JR. U.S. COURTHOUSE

Address US DISTRICT COURT, SOUTHERN DISTRICT OFFICE

Address 400 NORTH MIAMI AVENUE

City MIAMI     State/Province FL

Country USA     ZIP/Postal Code 33128

2 To

Recipient's Name NATIONAL BANK OF UKRAINE     Phone

Company

Address ST. INSTITUTSKA, 9

City KYIV-8

Country UKRAINE     ZIP/Postal Code 01601

Recipient's Tax ID Number for Customs Purposes

3 Shipment Information

Total Packages 1     Total Weight ___ lbs/kg

Commodity Description

4 Express Package Service

☑ FedEx Int'l Priority
☐ FedEx Int'l First
☐ FedEx Int'l Economy

5 Packaging

☐ FedEx Envelope
☐ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ Other
☑ FedEx 10kg Box
☐ FedEx 25kg Box

6 Special Handling

☐ HOLD at FedEx Location
☐ SATURDAY Delivery

7 Payment

Bill transportation charges to:
☑ Sender
FedEx Acct. No.

☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check/Cheque

Bill duties and taxes to:
☐ Sender   ☐ Recipient   ☐ Third Party

8 Your Internal Billing Reference

9 Required Signature

Sender's Signature

For Completion Instructions, see back of fifth page.

FedEx Tracking Number 8042 9671 1532

**Ship and track packages at fedex.com**

Questions? Go to our Web site at fedex.com.
Or in the U.S., call 1.800.GoFedEx 1.800.463.3339. Outside the U.S., call your local FedEx office.

Form ID No. 0402

568

PACKAGE LABEL
804296711532

COMMERCIAL INVOICE LABEL
804296711532

DELIVERY RECORD LABEL
804296711532

DELIVERY REATTEMPT LABEL
804296711532

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
SOUTHERN District of FLORIDA

FILED BY _____ D.C.

**JAN 27 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

)
)
)
)
OLEG ZHUKOVSKIY            )
*Plaintiff(s)*            )
v.                        )                    1:21-cv-20019-JEM
                          )
                          )
                          )
                          )
NATIONAL BANK OF UKRAINE   )
*Defendant(s)*            )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

NATIONAL BANK OF UKRAINE
ST. INSTITUTSKAYA, 9
KYIV-8, 01601
UKRAINE

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

HAROLD E. PATRICOFF, ESQ.
SHUTTS & BOWEN, LLP
200 S. BISCAYNE BLVD., SUITE 4100
MIAMI, FLORIDA 33131
305-379-9189

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**



Date: _____ Jan 6, 2021 _____

*s/ C.Davis*

Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
SOUTHERN District of FLORIDA

| | |
|---|---|
| )<br>)<br>)<br>)<br>OLEG ZHUKOVSKIY )<br>_Plaintiff(s)_ )<br>v. )<br>)<br>)<br>NATIONAL BANK OF UKRAINE )<br>_Defendant(s)_ ) | Civil Action No. 1:20-CV-20019-JEM |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

        NATIONAL BANK OF UKRAINE
        ST. INSTITUTSKAYA, 9
        KYIV-8, 01601
        UKRAINE

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   HAROLD E. PATRICOFF, ESQ.
                          SHUTTS & BOWEN, LLP
                          200 S. BISCAYNE BLVD., SUITE 4100
                          MIAMI, FLORIDA 33131
                          305-379-9189

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                                        *CLERK OF COURT*

Date: _____          _____
                                          *Signature of Clerk or Deputy Clerk*

АО 440 (Вер. 06/12) Повідомлення про цивільний позов

# ОКРУЖНИЙ СУД
# СПОЛУЧЕНИХ ШТАТІВ
Південного округу штату Флорида

ОЛЕГ ЖУКОВСЬКИЙ,                          )
                                          )
                                          )
_____           )
*Позивач(і)*                              )
         проти                            )     Цивільний позов № 1:20-CV-20019-JEM
                                          )
НАЦІОНАЛЬНИЙ БАНК УКРАЇНИ                  )
                                          )
                                          )
_____           )
*Відповідач(і)*                           )

## ПОВІДОМЛЕННЯ ПРО ЦИВІЛЬНИЙ ПОЗОВ

Кому: *(Ім'я та адреса*
*Відповідача)*            НАЦІОНАЛЬНИЙ БАНК УКРАЇНИ
                         вул. Інститутська, 9
                         Київ-8, 01601
                         УКРАЇНА

Проти вас подано позов.

Протягом 21 дня після вручення вам цього повідомлення про позов (не враховуючи дня, коли ви його отримали) — або протягом 60 днів, якщо ви є резидентом або агентством Сполучених Штатів Америки, чи посадовою особою або працівником в Сполучених Штатах Америки, описані в Федеральні правилі цивільного судочинства № 12 (а)(2) або (3) — ви повинні надати позивачу відповідь на доданий позов або клопотання відповідно до Правила 12 Федеральних правил цивільного судочинства. Відповідь або клопотання повинні бути надіслані позивачу або повіреному позивача, ім'я та адреса якого вказані нижче:

                         ХЕРОЛД Е. ПЕТРІКОФ, ЕСК.
                         ШУТС ЕНД БОУЕН ЛЛП
                         200 ПІВДЕННИЙ БІСКЕЙН
                         БУЛЬВАР, ОФІС 4100
                         МАЙАМІ, штат ФЛОРИДА 33131
                         305-379-9189

Якщо ви не зможете надати відповідь, проти вас буде винесено заочне рішення щодо задоволення вимоги, що зазначена у позові. Ви також повинні надати свою відповідь або клопотання до суду.

                         СЕКРЕТАР СУДУ

Дата: _____        _____
                                    *Підпис секретаря або заступника секретаря*

Переклад тексту цього документа з англійської мови на українську мову виконано перекладачем бюро перекладів «Анна Світ» Горбик Майєю Євгеніївною.

Підпис: _____.

Директор ПП БП „Анна Світ"
Ліпов Ю. І.

Прошито, пронумеровано та скріплено печаткою_____4_____аркушів.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

Oleg Zhukovskiy,

      Plaintiff,

v.

National Bank of Ukraine,

      Defendant.

_____/

## **COMPLAINT**

Plaintiff Oleg Zhukovskiy ("Plaintiff" or "Mr. Zhukovskiy"), sues the Defendant National

Bank of Ukraine ("Defendant" or "NBU") and alleges as follows:

## I. **NATURE OF THE ACTION**

1.      This lawsuit arises out of the illegal laundering and wrongful taking of bank funds

by a Ukrainian and U.S. criminal group (hereinafter the "Criminal Enterprise"[1]), which enabled

NBU and its officials to participate in an elaborate scheme to (i) wrongfully take over a bank

known as JSB Brokbusinessbank ("Brokbusinessbank" or "BrokBank"), and (ii) raid BrokBank of

its deposits by individuals and companies, including specifically those based out of Miami,

Florida, and (iii) utilize those funds for money laundering, part of which were converted and

transferred to, and through, various entities including, *inter alia*, PJSC CB PrivatBank

---

[1] The Criminal Enterprise is comprised of the following individuals and entities, which are discussed in greater detail below, including their nexus and connection to the theft of Plaintiff's Funds, and those actions and activities taking place in Miami, Florida: (1) Brokbusinessbank; (2) Sergei Arbuzov; (3) Viktor Yanukovych; (4) Igor Sorkin; (5) Valeria Gontareva; (6) NBU; (7) Sergei Kurchenko; (8) Real Bank; (9) Igor Kolomoisky; (10) Gennadiy Boholiubov; (11) Mordechai Korf; (12) Uriel Laber; (13) Optima Industrial Management, LLC; (14) Optima International; (15) Optima Ventures, LLC; (16) Ukrnafta; (17) PrivatBank, and each of their affiliates, agents, and related companies.

("PrivatBank"), to the detriment of BrokBank's depositors. As set forth below, this was done with the knowledge, consent, and assistance (through action and inaction) of NBU and its officials for the profit and the benefit of NBU and its officials. In 2013, NBU officials allowed the improper "purchase" and takeover of BrokBank by the Criminal Enterprise, and then allowed BrokBank reserves to be depleted and laundered through a vast scheme perpetrated by various individuals and entities (including the Criminal Enterprise) to manipulate, launder, and convert Plaintiff's funds through accounts, real estate, companies, and individuals around the United States (including specifically, a money laundering operation based out of Miami, Florida).

2.      Plaintiff is the assignee of all legal rights to pursue the legal claims to recover damages relating to certain deposits, which the Defendant misappropriated, as discussed below, including over $300 million[2] in damages. These deposits and damages are comprised of over $102 million in principal, together with interest, penalties, lost profits, and compensatory, statutory, punitive, and all other damages and claims in connection with the funds (collectively, the "Funds" or "Plaintiff's Funds"). The Funds deposited in BrokBank were the property of: two companies, ZUKK Trading Limited ("Zukk") and Intertransgroup LLC ("Intertrans"); and two individuals, Nikolay Kovzel ("Mr. Kovzel") and Vitaly Didylivsky ("Mr. Didylivsky") (collectively, the "Investors" or the "Assignors"). On September 14, 2020, the Investors assigned all of the legal rights in relation to the invested Funds to the Plaintiff for purposes of collection, which includes the rights to pursue the causes of action contemplated herein (the "Assignments"). True and correct copies of the assignments, together with certified English translations, have been attached hereto as **Exhibit "A."**

---

[2] All references in this letter to "$" relate to United States Dollars, unless otherwise indicated.

2

3.      After the BrokBank funds were converted and depleted, Ukraine (through the Prosecutor's Office) initiated criminal actions against several individuals involved in the criminal scheme, and seized an amount in excess of $2.25 billion from the Criminal Enterprise. Ukraine then distributed in excess of $172 million to NBU, but NBU did not return the wrongfully-taken funds back to the depositors of B-Bank, including the Plaintiff's Assignors.  Instead, NBU wrongfully retained the funds for the Criminal Enterprise, and for NBU and its officials, and used the BrokBank funds (which belonged to private individuals and companies) to repay interest on Ukrainian government debt (the "Bonds"), including specifically, the repayment of interest to U.S. companies, including but not limited to Franklin Templeton Investments ("Franklin Templeton"), T. Rowe Price, and TCW Group (collectively, the "U.S. Mutual Funds"), holding the Bonds, many of which are located, do business, and have offices in Florida.

4.      Thus, NBU, through its officials, leadership, and the Criminal Enterprise, have successfully brought the illicit money laundering scheme to completion. Plaintiff's Funds were siphoned out of BrokBank and then laundered through companies in Florida, then seized by Ukraine, and distributed to NBU. Facing pressure from holders of Ukrainian government bonds (including the U.S. Mutual Funds), NBU decided to use Plaintiff's Funds to pay interest on Ukrainian government bonds here in Florida instead of returning Plaintiff's Funds to the deposit holders, including the Plaintiff's Assignors (together with applicable interest, penalties, and other damages). As a result, those Funds remain due and owing to the Plaintiff, together with all applicable interest, penalties, and other damages.

5.      In this action, Plaintiff seeks over $300 million in damages, and such other and further relief and sanctions as the Court may order.

## II. **PARTIES, JURISDICTION AND VENUE**

6.      Plaintiff, Mr. Zhukovskiy, is a U.S. permanent resident, who resides in the U.S. and who is the assignee of all legal rights to pursue the legal claims to recover deposits, and damages, related to Plaintiff's Funds which NBU misappropriated and all other legal rights to pursue claims against the Defendant. *See* **Exhibit "A."** As noted, the purpose of the Assignments was to transfer the right to pursue all legal claims to Plaintiff, so that he can pursue those claims on behalf of the Assignors in the United States and abroad. Among the rights assigned and transferred were the rights to pursue the causes of action contemplated herein. Defendant was notified of the assignment in writing through a demand letter dated October 29, 2020 (the "October 29, 2020 Demand Letter"). *See* **Exhibit "B."**

7.      The Defendant is "an agency of instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b), and is thus a "foreign state" pursuant to § 1603(a).

8.      This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a).  Accordingly, this Court has jurisdiction over NBU pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603. This Court also has jurisdiction over this civil action under 28 U.S.C. § 1331, in that Plaintiff alleges violations of federal law, namely laundering of money instruments, pursuant to 18 U.S.C. § 1956(b).

9.      Defendant is not immune from the jurisdiction of this Court in this case under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, pursuant to (i) 28 U.S.C. § 1605(a)(2) and (ii) 28 U.S.C. § 1605(a)(5).

a.     The commercial activity exception to immunity under 28 U.S.C. § 1605(a)(2) applies where the lawsuit is: (1) "based . . . upon an act outside the territory of the United States"; (2) taken "in connection with a commercial activity" of NBU outside the United States; and (3) which "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Under 28 U.S.C. § 1605(a)(2), Defendant has performed acts in the United States in connection with a commercial activity of the foreign state elsewhere. Also pursuant to 28 U.S.C. § 1605(a)(2), Defendant has performed acts outside the territory of the United States in connection with a commercial activity, and said acts have caused a direct effect in the United States.

b.     The commercial activity exception to immunity under 28 U.S.C. § 1605(a)(5), provides that a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment. 28 U.S.C. § 1605(a)(5).

10.     The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Pursuant to 28 U.S.C. § 1603(e), a "'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States. NBU has engaged in commercial activities in the U.S. on several occasions, including but not limited to the following:

5

(i)     Defendant's agents and representatives flew several times to the United States to solicit investments in Ukrainian Government Bonds, which were sold to American citizens and companies, including the U.S. Mutual Funds.

(ii)     Defendant, through its officials acting in their official capacity, orchestrated, caused, permitted and consented to money laundering conducted by Sergey Kurchenko ("Kurchenko") together with the Miami Parties (as discussed below) and companies and individuals based in Florida, on behalf of NBU, its officials, and the Criminal Enterprise.

(iii)     NBU converted Plaintiff's Funds and used them to repay interest on Ukrainian Government Bonds in the United States, which is an example of a purely commercial activity that precludes Defendant from asserting sovereign immunity under the FSIA.

11.     Jurisdiction is also proper under 28 U.S.C. § 1605 because this action is based upon a commercial activity, namely, it arises out of over $102 million in principal value of deposits and investments of funds deposited into BrokBank, which were commercial transactions.[3]  Thereafter, the Criminal Enterprise, and with the knowledge, consent, and permission of NBU officials acting in their official capacity, converted Plaintiff's Funds at BrokBank and successfully laundered and converted the funds through commercial transactions with companies and by individuals based in Miami, Florida. Subsequently, NBU used Plaintiff's Funds to pay for interest on government bonds in the United States, which were also commercial transactions.

12.     Pursuant to 28 U.S.C. § 1605(a)(5), Defendant and its officials have committed tortious acts and/or omissions in the United States, which caused damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of

---

[3] As discussed below in Section III.

6

any official or employee of that foreign state while acting within the scope of his or her office or employment.

13.      Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(f)(1) and (b)(2), (3), in that a substantial and material part of the events or omissions giving rise to the claims in this Complaint occurred within this District. Specifically, in connection with illegal actions and inactions, NBU and its officials working in concert with the Criminal Enterprise, participated in complex money laundering schemes converting hundreds of millions of dollars in the Ukraine and in the United States.

14.      As discussed below, these illegal schemes involved, among others, wrongful actions by Igor Kolomoisky ("Kolomoisky") and his companies, including but not limited to Optima Industrial Management, LLC, Optima International, Optima Ventures, LLC (collectively, the "Optima Group") all operating out of 200 South Biscayne Boulevard, Suite 5500, Miami, Florida,[4] and PrivatBank, together with another oligarch, Gennadiy Boholiubov ("Boholiubov"), as well as Mordechai Korf, also known as "Motti" ("Korf"), and Uriel Laber ("Laber"), also operating out of the same offices in Miami (collectively, the "Miami Parties"[5]) all on behalf of, and on the direction of, NBU and its officials.

15.      Although Kurchenko and his companies illegally funneled the funds out of BrokBank on behalf of NBU and its officials and others, Kurchenko partnered with the Miami Parties to launder the funds siphoned from BrokBank through PrivatBank and a complex array of companies and individuals, based in Miami, Florida, to completely disguise the nature, source, ownership, and control of the funds including Plaintiff's Funds. NBU then used Plaintiff's Funds

_____

[4] Coincidentally, Optima Group's offices are located in same building in downtown Miami as Plaintiff's counsel's offices (the Southeast Financial Center).

[5] Discussed in Section IV.(B) below.

7

to, among other things, repay of interest on Ukrainian government-issued Bonds. On information and belief, these payments were made to, *inter alia*, investment firms located in Florida, as discussed below.

### III.  GENERAL ALLEGATIONS

#### I.  Background for Investments and Dispute

16.     This dispute arises out of deposits made by the Investors into a Ukrainian bank known as BrokBank.

17.     In particular, between 2012 and 2013, the Investors deposited the U.S. Dollar equivalent of $102,207,909.46 in funds with BrokBank. Pursuant to deposit agreements, BrokBank was to hold Plaintiff's Funds and in exchange, pay interest to the Investors just as any ordinary bank would pay interest on a savings account or a Certificate of Deposit, for example.

18.     Unfortunately, over time, Plaintiff's Funds were converted by the Criminal Enterprise and NBU with the assistance of officials at NBU, acting in their official capacity. Those Funds were then laundered through a network of fraudulent companies, including through entities and individuals based in Miami, Florida, and used to purchase real estate throughout the United States. The remaining Funds were then seized by Ukraine and used by NBU for its own benefit – namely, the repayment of Ukrainian government bond interest payments to U.S. investment companies, including the U.S. Mutual Funds (which had purchased the bonds for U.S. investors). The background regarding NBU and its officials, as well as the entities and individuals involved in the coordinated scheme of the raiding of BrokBank, and their interconnectedness, is set forth in detail below.

19.     In April 2017, information appeared in the press that the Kramatorsk District Court of the Donetsk region in Ukraine, ordered the confiscation of funds from accounts in Sberbank, to the state budget of the government of Ukraine in the amount of in excess of $2.25 billion, which

8

occurred in January 2015. On April 28, 2017, the Prosecutor General of Ukraine announced that Sberbank had completed the procedure for transferring the confiscated funds to the Ukrainian State Treasury. At that time, the President of Ukraine, Petro Oleksiyovych Poroshenko "Poroshenko"), stated that these funds will be used by Ukraine to primarily strengthen the army.

20.    An amount in excess of $172 million was transferred to NBU, which amount included Plaintiff's Funds, which NBU purportedly used to pay interest on government debt obligations, including to American investment companies, in Florida. However, among the funds confiscated by the state of Ukraine were those converted by the Criminal Enterprise, including Plaintiff's Funds. Instead of returning the funds to Plaintiff, NBU used the funds for its own benefit, and now is liable for damages as a result.

## IV.  THE CRIMINAL ENTERPRISE – INTRODUCTION OF EACH ACTOR

### 1.  First Actor: BrokBank

21.    Before its insolvency, BrokBank was a well-known and respected financial institution in Ukraine. Its origins can be traced to the very beginning of Ukraine.  BrokBank was registered as a bank by the NBU in October 1991, and it grew to become one of the largest banks in Ukraine until it was illegally raided by NBU and the Criminal Enterprise of its deposits, including Plaintiff's Funds at issue.

22.    As of 2014, BrokBank was Ukraine's 16th largest bank in terms of assets. Central bank figures showed BrokBank having assets worth in excess of $3.47 billion[6] at the start of 2014.

23.    In 2007, the controlling shareholders of BrokBank consisted of two wealthy Ukrainian brothers: Sergei Buryak and Oleksandr Buryak (collectively, the "Buryak Brothers").

---

[6] Calculated at the rate of 0.12 UAH to 1 USD, as of January 1, 2014.

Both were well-known Ukrainian businessmen and were also members of the Ukrainian parliament.

24.     In early 2013, the Buryak Brothers decided to sell their controlling interest in BrokBank.

25.     The sale of the Buryak Brothers' majority interest in BrokBank required NBU's official approval and consent. Under Ukrainian legislation, the sale of 10% or more in securities held at BrokBank required express approval by NBU. Nevertheless, the former chairman of NBU, Sergei Arbuzov ("Arbuzov"), brokered a deal to sell BrokBank to a set of companies controlled by the 35-year-old Ukrainian oligarch and businessman Sergey Kurchenko[7] .

26.     Kurchenko, who is discussed in greater detail below, has been sanctioned in many countries (including the United States, United Kingdom, and European Union) and indicted and arrested in absentia in Ukraine for money laundering, among other illegal activities.[8] Kurchenko was sanctioned by the United States[9] and the European Union[10], together with other high-ranking officials in the government of Ukraine, namely Artem Pshonka, the son of the former Prosecutor

---

[7] Discussed in section IV. 7 below.

[8] In Ukraine, charges were brought in criminal case №758 / 15964/17, against the former Brokbusinessbank deputy director of the investment activity department, Vinograd Yuri ("Vinograd"). Vinograd pled guilty to being part of the criminal organization headed by Kurchenko, as indicated in the court's verdict dated January 9, 2018. Importantly, the Ukrainian criminal court also found that in March 2010 Kurchenko organized and headed a criminal organization, through which Kurchenko created and/or acquired more than 400 companies to carry out fictitious activities.

[9] On March 6, 2014, the United States imposed major sanctions through Executive Order ("EO") 13660 which authorizes sanctions on individuals and entities responsible for violating the sovereignty and territorial integrity of Ukraine, or for stealing the assets of the Ukrainian people. In July 2015, the United States imposed sanctions on Kurchenko pursuant to EO 13660.

[10] On March 5, 2014, the Council of the European Union also imposed major sanctions froze the accounts of Ukraine's former president, Viktor Yanukovych, his sons and 15 other people from his inner circle, including Kurchenko, and former first vice prime minister (and former Chairman of NBU), Arbuzov, among others.

10

General of Ukraine Viktor Pshonka, and Oleksandr Yanukovych, the eldest son of former President Viktor Yanukovych ("Yanukovych"). In early 2019, Yanukovych, who remains in Russia, was convicted on treason charges in Ukraine in absentia and was sentenced to 13 years in prison.

27.     The takeover of BrokBank was improper from the start. On or about July 18, 2013, a company named "SEPC", owned by Kurchenko, announced that it had acquired an 80% interest in BrokBank. In order to avoid obtaining the express permission of NBU, Kurchenko created eight (8) fictitious shell companies (collectively, the "Kurchenko Shell Companies") wherein each company individually purchased a 9.9836% interest in BrokBank. All of the companies were registered during a one-week period, and each purchased an identical percentage of shares (just shy of the 10% threshold) in BrokBank to evade Ukrainian legal restrictions. In addition, Kurchenko's company, SEPC, purchased a 0.1585% interest in the Bank.

28.     Kurchenko controlled SEPC and the Kurchenko Shell Companies, and through the architected scheme of piecemeal purchase of interests, was able to acquire over 80% (eighty percent) of the shareholding in BrokBank in clear deviation and violation of Ukrainian law.

29.     NBU officials fostered, permitted and participated in Kurchenko's improper takeover of BrokBank, which directly preceded the illegal siphoning of funds from the Bank, by approving Kurchenko's fraudulent scheme to acquire BrokBank through the eight (8) Kurchenko Shell Companies.  This fraudulent scheme was approved by NBU officials, including Arbuzov, and his successor, Igor Sorkin ("Sorkin").[11]

---

[11] Sorkin was approved as the new NBU chairman by the Ukrainian Parliament on January 11, 2013, after he was appointed by his close ally Arbuzov, when Arbuzov was appointed first Deputy Prime Minister of Ukraine. Sorkin previously held the position of NBU deputy governor in charge of bank supervision. Sorkin held the position as the chairman of NBU from January 11, 2013 to February 24, 2014.

30.     Kurchenko's fraudulent scheme to take over BrokBank (without meeting, and/or by evading, the proper Ukrainian legal requirements and authorizations) was uncovered and confirmed by the Antimonopoly Committee of Ukraine, in Case No. 656-r. By its decision issued on November 20, 2018, the Antimonopoly Committee of Ukraine found, among other things, that the Kurchenko Shell Companies had common interests and were related to Kurchenko, and therefore imposed a fine of UAH 15,000,000.00 ($544,050.00)[12] against Kurchenko. Although Kurchenko appealed this decision, on November 27, 2019, the Commercial Court of Kyiv, in Ukraine, adopted and affirmed the November 20, 2018 decision of the Antimonopoly Committee of Ukraine No. 656-r.

### 2. Second Actor – Arbuzov (NBU official) is Appointed to NBU, Becomes Vice Prime Minister of Ukraine, Is Removed from Office, Flees to Russia, and Is Sanctioned by OFAC

31.     NBU officials supported and took actions (and inactions), which allowed Plaintiff's Funds to be wrongfully laundered and converted from BrokBank by the Criminal Enterprise, including the Miami Parties who operated out of the Optima Group companies, headquartered in Miami, Florida. Arbuzov was one of the NBU officials involved.

32.     In September 2010, Arbuzov was appointed deputy chairman of NBU. Only three months later, on December 21, 2010, the President of Ukraine sent a petition to the parliament to appoint Arbuzov as the chairman of NBU. On December 23, 2010, the Ukrainian parliament approved the petition, making Arbuzov the youngest chairman of a state central bank. Thereafter, two years later, on December 24, 2012, Yanukovych, then the Ukrainian President, appointed Arbuzov as First Vice Prime Minister of Ukraine by presidential decree. When Arbuzov stepped

---

[12] Calculated at the rate of 0.03627 UAH to 1 USD, as of November 20, 2018.

up to his new post, he undertook efforts to ensure that his close ally, Sorkin, would assume his position and become the new NBU Chairman.

33.     Arbuzov subsequently fled Ukraine. On January 3, 2020, Arbuzov was detained in absentia by the High Anti-Corruption Court in Ukraine in accordance with the requirements of part 6 of article 193 of the Code of Criminal Procedure of Ukraine, on charges of misappropriation and embezzlement of property or taking it by abuse of power, which led to the embezzlement of the National Bank's assets in the amount of UAH 220 million (over $7.7 million). On January 12, 2015, Yanukovych became an international fugitive when INTERPOL issued a red notice against him for charges including embezzlement and misappropriation.

34.     Throughout the time they held their official posts at NBU, and in other government positions in the government of Ukraine, Arbuzov and Sorkin supported and took actions (and inactions), which would allow Plaintiff's Funds to be siphoned from BrokBank by the Criminal Enterprise, including the Miami Parties who operated out of Miami, Florida. Arbuzov and Sorkin had the support of the then-President of Ukraine, Yanukovych.

35.     NBU officials, acting in their official capacity, were complicit in, and participated in, the scheme by which Kurchenko depleted the funds out of BrokBank. NBU officials, acting in their official capacities, allowed backdoor opaque transactions and other illegal schemes to transfer funds out of BrokBank, where NBU and its officials would intentionally act (or abstain from acting) in complicity with a fraudulent scheme to deplete the assets of the Bank. In addition, NBU was complicit in and in its failure to supervise and regulate BrokBank.

### 3.   <u>Third Actor – Ukrainian President Yanukovych Embezzles Funds; Is Removed from Office, Flees to Russia, and Is Sanctioned by OFAC</u>

36.     However, the house of cards came crashing down when Yanukovych was pushed out of office and accused of human rights violations in Ukraine and embezzlement of funds. On

February 22, 2014, 328 of 447 members of the Ukrainian parliament (MPs)—or about 73% of the MPs—voted to "remove Viktor Yanukovych from the post of president of Ukraine" on the grounds that he was unable to fulfill his duties.

37.    On January 28, 2014, after extensive protests in Ukraine, the Ukrainian Prime Minister, Mykola Azarov ("Azarov") resigned and fled to Russia. As a result, Arbuzov (who was the Vice Prime Minister) became Prime Minister of Ukraine on that date. Shortly after being appointed, Arbuzov fled the country. Arbuzov became a fugitive when the General Prosecutor of Ukraine requested that INTERPOL add him to its wanted list. Currently, Arbuzov is believed to be hiding in Russia.

38.    As a result, on September 11, 2015, the Prosecutor General's Office of Ukraine requested the seizure of funds, believed to be affiliated with Arbuzov as part of NBU and its officials' plan to launder and convert Plaintiff's Funds. As a result, $49.3 million was reportedly seized from companies affiliated with Arbuzov by a Latvian court.

39.    In April 2014, the acting Prosecutor General Oleg Makhnitsky reported that while president from 2010, Yanukovych personally ran a multi-billion-dollar criminal syndicate whose tentacles reached throughout almost all walks of the Ukrainian state and Ukrainian life. "Ex-President Viktor Yanukovich headed a mafia structure in Ukraine which spread across different state structures," Makhnitsky reported in London to the international investing community after meeting U.S. and British officials about ways to recover stolen assets.

40.    In April 2014, U.S. Attorney General Eric Holder publicly stated that the United States was determined to help Ukraine find billions of dollars it says were stolen by Yanukovych and his aides. "We are determined to hold accountable those who were responsible for the theft of these Ukrainian assets . . . There should be no mistake, we are determined in our effort to be

14

successful, we are determined to hold accountable those who were responsible for the theft of these Ukrainian assets, and we are also determined to make sure these assets are returned to the Ukrainian people."

41.     On March 11, 2015, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") imposed sanctions on Arbuzov pursuant to Executive Order 13660 (EO 13660), which authorizes the United States to impose sanctions on certain persons if they are found to have engaged in certain actions or policies that contribute to the situation instability in Ukraine. This was in addition to sanctions imposed on Arbuzov by the European Union on March 5, 2014, by as discussed above.

### 4. Fourth Actor – Sorkin (NBU official) Replaces Arbuzov as NBU Chairman, but Now Is Wanted by Ukrainian Prosecutor General's Office for Embezzlement

42.     Sorkin, who was appointed to replace Arbuzov's position at NBU, has been designated by Ukraine on an all-Ukrainian wanted list on suspicion of committing offenses established by article 191 pt. 5 article 255 pt. 1 of the Criminal Code of Ukraine. In particular, the Ukrainian Prosecutor General's Office has been investigating the criminal proceedings No. 42015000000001955, which were initiated on or about September 18, 2015, on suspicion of Sorkin, as the former Chairman of NBU. On September 7, 2015, the Ukrainian Prosecutor General's Office issued a notice of suspicion regarding Sorkin in committing crimes under Part 1 of Art. 255 (creation of a criminal organization) and Part 5 of Art. 191 (misappropriation, embezzlement or possession of property by abuse of office) of the Criminal Code. The Notice of Suspicion is the equivalent of an indictment under U.S. law.

43.     On March 1, 2016, an arrest warrant was issued for Sorkin's detention.  However, Sorkin fled Ukraine as of September 20, 2014.

15

**5. Fifth Actor – Gontareva (NBU official) becomes NBU Chairwoman, but Now Is the Subject of Criminal Case Involving BrokBank, and Assisting in a Criminal Organization**

44.     As part of the Criminal Enterprise, Valeria Gontareva ("Gontareva") was involved in money laundering of funds out of BrokBank, and as Chairwoman of NBU, she intentionally did not take any actions to return the misappropriated Funds back to BrokBank, or to return Plaintiff's Funds to the Investors or the Plaintiff.

45.     In 2014, after the inauguration of Ukraine's new President Petro Poroshenko[13] ("Poroshenko"), a new composition of the Cabinet of Ministers of Ukraine was formed, and a new leadership of NBU (the board and supervisory board) was appointed.

46.     On June 19, 2014, Gontareva was appointed Chairwoman of NBU.

47.     Previously, Gontareva served as Chairwoman of Investment Capital Ukraine ("ICU"), a Kyiv-based financial company, from 2007 to 2014. She reportedly sold all of her stake in the company (all shares and interest) before becoming Chairwoman of NBU. However, there were controversial discussions about the independence of her policy due to her close relation with the former Ukrainian President Poroshenko.

48.     In particular, during Gontareva's role as Chairwoman of ICU, the ICU company acted as an intermediary company which received money involving transfers to and from BrokBank, and in particular, a Ukrainian-state-owned entity known as the PJSC Agrarian Fund ("Agrarian Fund").

49.     On March 28, 2019, the Prosecutor General's Office of Ukraine initiated an investigation into Gontareva regarding her participation in a criminal organization and her

---

[13] Poroshenko is a prominent Ukrainian oligarch, businessman and politician, who served as the fifth President of Ukraine from June 7, 2014 to May 20, 2019.

16

assistance in the illegal seizure of another's property – monetary funds of Agrarian Fund worth UAH 2.069 billion by making fake "contracts of sale and purchase" of government domestic loan bonds with Agrarian Fund under direct repurchase agreements with NBU.

50.     According to the investigation into Gontareva, during November-December of 2013, offshore companies, with the help of the ICU company, which was led by Gontareva, and with the knowledge, consent, and complicity of NBU and its officials, transferred funds from BrokBank to the accounts of Sberbank in Ukraine and purchased foreign currency bonds.

51.     On March 28, 2019, it was reported that the Ukrainian Prosecutor General's Office suspected the inner-circle of Poroshenko of assisting in the crimes of the fugitive oligarch Kurchenko in the "Kurchenko case," which unites numerous grave crimes committed over the previous 10 years. This is the matter involving the embezzlement of billions of dollars and the legalization of these illegal proceeds. The investigation of the Prosecutor General's Office called the defendants in that case members of a "criminal organization of Viktor Yanukovych," and assigned one of the key roles to Kurchenko. Gontareva is also suspected of being a co-conspirator. Poroshenko appeared in court in Ukraine on June 18, 2020, for a pretrial hearing on charges related to alleged abuse of office during his presidency. This is one of around twenty cases in Ukraine involving Poroshenko.

52.     Thus, even after the change in government in Ukraine from Yanukovych, Arbuzov, and Sorkin, the new government in Ukraine (Poroshenko-Gontareva) was still covering up the illegal acts of the Criminal Enterprise and NBU and therefore was still not interested in returning the misappropriated funds to BrokBank so that it could resume normal operations, due to their involvement in the conversion of the funds (and decision to retain the funds to the benefit of NBU, and to the detriment of the depositors of BrokBank).

17

53.     The former chairman of NBU, Gontareva, also appeared in investigations related to the money of Yanukovych (convicted in absentia) and Kurchenko (detained in absentia) of crimes involving money laundering and whose assets have been frozen by Ukraine. The verdict of the Kramatorsk Court, which confiscated Yanukovych's so-called $2.25 billion, discusses the ICU financial company, which was led by Gontareva.

54.     ICU was one of the companies involved in Kurchenko's scheme of U.S. and offshore companies, by purchasing foreign currency bonds of government loans, thus legalizing the converted money. In fact, Gontareva's ICU helped move and launder the stolen $2.25 billion, which monies included Plaintiff's Funds funneled out of BrokBank.

55.     Thus, Gontareva, while serving as Chairwoman of NBU, and thus a government official of Ukraine, deliberately did not take any actions to return the misappropriated Funds back to BrokBank, or to make whole the Investors and other creditors of BrokBank, from which the confiscated money was stolen.

### 6.  Sixth Actor – The National Bank of Ukraine

56.     NBU is a Ukrainian government agency and/or instrumentality, which is tasked with regulating the banking sector, supervising the activities of commercial banks, and responding to (and preventing) irregularities in the banking sector.

57.     The activities of NBU are strictly controlled pursuant to the Law of Ukraine, On the National Bank of Ukraine. Pursuant to Section X. Banking Regulation and Banking Supervision, Article 55, the main purpose of the laws on banking regulations and supervision establishing the duties and obligations of NBU, is to ensure the security and financial stability of the Ukrainian banking system, and for protection of the interests of depositors and creditors of NBU and other Ukrainian banks.

18

58.     Pursuant to Section IV, Chapter 12, Article 67, and Chapter 14, Article 71 of the Law of Ukraine, On Banks and Banking, NBU is required to ensure the stability of the banking system and to protect the interests of bank depositors and creditors with regard to the security of customer funds in bank accounts, including BrokBank. Additionally, NBU is legally obligated to supervise banking activities on all commercial banks operating in Ukraine through, among other activities, conducting annual audits and on-site controls.

59.     The Ministry of Finance of Ukraine, in conjunction with NBU, also offers government bonds for sale around the world, including in the United States. For example, in 2013, the government of Ukraine lobbied Franklin Templeton by sending Arbuzov, the Ukrainian First Vice Prime Minister[14] at the time, and former Chairman of the NBU[15] to the United States to attempt to convince Franklin Templeton, a global investment firm with offices in Florida, to purchase and hold its bonds.

60.     As a result, by 2014, Franklin Templeton, based in the United States, was one of the largest purchasers of Ukrainian international debt. It was reported that as of August 2014, Franklin Templeton owned Ukrainian government obligations with a face value of almost $5 billion, which was reported to be ***nearly a fifth of Ukraine's country's outstanding international government bonds*** in 2014.

61.     At all times material to this suit, NBU, as a Ukrainian government agency and/or instrumentality, not only failed in its duties to regulate banks, including BrokBank, and prevent irregularities, but instead, took actions and consciously failed to take actions and NBU's officers and officials actively participated in the intentional depletion of funds from BrokBank.

---

[14] Arbuzov held this role from December 24, 2012 to January 28, 2014.

[15] Arbuzov held this role from December 23, 2010 to December 24, 2012.

62.     After Ukraine seized the funds which were the proceeds of the illegal money laundering operation, including operations in the United States in connection with the depletion of funds from BrokBank, NBU should have returned the wrongfully converted funds to the depositors of BrokBank.

63.     Instead, on March 4, 2014, BrokBank was forced into insolvency by NBU, and its banking license was revoked on June 10, 2014. The Investors, and other depositors of Brokbank, were led to believe that their funds would be returned upon completion of the liquidation proceedings.

64.     However, the liquidation of BrokBank was concluded on October 15, 2019, and NBU failed to return all of the funds wrongfully taken, including the Plaintiff's Funds. Instead of returning the assets to the depositors of BrokBank, NBU then used those Funds (which were the proceeds of a money laundering scheme operating from Miami, Florida) for its own benefit. For example, among other things, NBU used those funds to repay interest on Ukrainian government bonds in the United States, including payments made to American investment companies in Florida.

65.     NBU and its officials (many of whom were since sanctioned for misconduct, including embezzlement, theft, and fraud) were complicit in, and participated in, the scheme by which Kurchenko initiated and executed the process of depleting the funds out of BrokBank.[16] The officials of NBU stood to profit from the siphoning of funds from BrokBank, where NBU officials would act (or abstain from acting) in connection with a fraudulent scheme to deplete the assets of

---

[16] For example, funds were transferred out of Brokbusinessbank, used to pay for various false expenses (e.g., for transportation, processing and storage of oil), transferred through the Optima Group companies, to other entities, and banks, including PrivatBank, and transferred to the Criminal Enterprise, as well as NBU officials, for their own benefit.

20

BrokBank. NBU used the seized laundered Funds for NBU's own benefit, including paying Ukrainian government bond interest payments, to bondholders including those in the United States, instead of repaying the Investors and other depositors of BrokBank.

66.     After Ukraine seized the laundered funds from the Criminal Enterprise, and after BrokBank was forced into insolvency, instead of returning the seized funds to the depositors of BrokBank, including Plaintiff's Assignors, NBU then used those converted funds for its own purposes, such as repaying government bond interest (including in the United States, and in Florida).

67.     After Kurchenko improperly exercised control over BrokBank and depleted that bank of all of its assets, he took further actions with the knowledge and consent of NBU and its officials, including Arbuzov and Sorkin, to deplete the assets of BrokBank, including Plaintiff's Funds, through a network of fraudulent companies, and to launder money through entities and transactions in Florida, together with the help of Kolomoisky, Korf, and Laber, all operating out of Miami, Florida. Moreover, the Kurchenko Parties converted the funds from BrokBank, and coordinated with the Miami Parties to illegally launder and transfer Plaintiff's Funds, from BrokBank through a number of companies including those based in Miami, Florida, and through real estate purchases throughout the United States. This was all planned and executed by NBU, its officers, and the Criminal Enterprise, to disguise the nature, source, ownership, and control of the converted funds, including the Plaintiff's Funds.

### 7.  Seventh Actor: Sergey Kurchenko, and Real Bank (Eighth Actor)

68.     Also part of the Criminal Enterprise, Kurchenko would transfer the laundered funds, including Plaintiff's Funds, with the consent, knowledge of, and complicity of, the officials of NBU, embezzled and converted Plaintiff's Funds in Florida, with the Miami Parties. Kurchenko

21

is a 35-year-old Ukrainian oligarch and businessman and founder/owner of the group of gas companies in Ukraine specializing in trading of liquefied natural gas. Kurchenko is also the former owner and president of the soccer team, FC Metalist Kharkiv, and the Ukrainian Media Holding group.

69.     Kurchenko was reportedly closely connected to Yanukovych, who was removed from office over his attempts to align Ukraine with Russia rather than the European Union. As discussed above, the former president, Yanukovych, is himself accused by the current Ukrainian government of stealing billions of dollars from the state.

70.     Facing criminal charges, and the collapse of his Criminal Enterprise, Kurchenko fled Ukraine in February 2014 and he is currently a fugitive residing in Russia. In March 2014, Ukraine filed a request to place Kurchenko on the INTERPOL wanted list.

71.     On March 24, 2014 the general prosecutor's office of Ukraine announced an investigation into "the establishment of a criminal organization" by Kurchenko, who it described as "close to the 'family' of former President of Ukraine Viktor Yanukovych." His property and other assets have been seized by the government of Ukraine, including his interest in Metalist Kharkiv, and other assets.

72.     Two years later, on March 28 2016, the Prosecutor General of Ukraine announced that the Department of International Legal Cooperation of the Prosecutor General's Office completed the investigation of the criminal proceedings against Kurchenko, who is suspected of creating a criminal organization that committed crimes from January 2010 to February 2014. Kurchenko is charged with a number of criminal acts totaling in excess of $637 million, including:

a.   acquiring liquefied gas from Ukrnafta and Ukrgazvydobuvannya in the amount of UAH 2.196 billion ($77.3 million)[17];

b.   converting funds from NJSC "Naftogaz of Ukraine" in the amount of UAH 450.0 million ($15.8 million);

c.   converting funds from NJSC "Naftogaz of Ukraine" in the amount of UAH 5.100 billion ($179.6 million);

d.   converting funds from NBU in the amount of UAH 787.4 million ($27.7 million), which were allocated in the form of a stabilization loan to Real Bank;

e.   converting funds from Real Bank in the amount of UAH 4.707 billion ($165.8 million), which were issued in the form of loans to enterprises controlled by Kurchenko;

f.   converting funds from BrokBank in the amount of UAH 865.9 million ($30.5 million) by issuing interbank loans to Real Bank and placing them on a correspondent account with Real Bank;

g.   converting funds from BrokBank in the amount of UAH 1.437 billion ($50.6 million) by issuing loans to fictitious enterprises;

h.   converting funds belonging to Ukrgasbank in the amount of UAH 502.3 million ($17.7 million) by concluding fictitious agreements for the sale and purchase of Gosipoteka bonds;

i.   converting funds from PJSC "Agrarian Fund" in the amount of UAH 2.069 billion ($72.9 million) by concluding fictitious agreements for the sale and

---

[17] Calculated at the rate of 1 UAH to 0.03845 USD as of March 28, 2016.

purchase of domestic government bonds with the Agrarian Fund and direct REPO agreements with NBU.

73. During the course of the investigation of Ukraine's criminal case against Kurchenko, dozens of other persons were identified who were employed by his Criminal Enterprise. Plaintiff's Funds were among the funds converted by Kurchenko, with the knowledge, consent, and assistance of the NBU and its officials, and other persons. For example, when the Pechersky District Court of Kiev also arrested ex-NBU head Sorkin in absentia, Sorkin was also placed on the wanted list of the Prosecutor General's Office of Ukraine, and a warrant was issued for his arrest on suspicion of taking possession of more than UAH 2.8 billion from the Agrarian Fund by conspiracy with BrokBank officials.

74. During the spring of 2019, during the course of litigation in Kurchenko's criminal case, the Prosecutor General's Office of Ukraine also announced that the ex-head of NBU, Sorkin, may have been a coconspirator of Kurchenko while Kurchenko held a controlling interest of BrokBank.

75. On January 3, 2017, the investigating judge of the Pechersky District Court of Kyiv issued a ruling granting a repeated request by the Prosecutor General's Office to take preventive measures and ordering the detention of Kurchenko. The Prosecutor General's Office reported they were investigating Kurchenko on suspicion of establishing and managing a criminal organization and misappropriating property using state-run and private banking institutions, and state-owned enterprises of the fuel and energy sector in a large scale. As reported, the Prosecutor General's Office of Ukraine suspects Kurchenko of committing grievous crimes as the head of a criminal group beginning in early 2010, all of which led to the loss and conversion of the Plaintiff's Funds.

76.     Kurchenko also stands accused by the government of Ukraine of systematically evading millions of dollars in tax with the collusion of officials in Yanukovych's administration. Vitaly Yarema, general prosecutor of Ukraine, stated that Kurchenko was under investigation for allegedly failing to pay the state $130 million in tax and converting over $180 million from bank investors.

77.     The Ukrainian secret service has described Kurchenko as the "chief financial officer" of what has become known in Ukraine as "the family," a term for associates of Yanukovych that engaged in the scheme to embezzle millions from deposit holders of BrokBank and PrivatBank, which amount included Plaintiff's Funds. During 2014 Arsen Avakov, Ukraine's interior minister stated: "Kurchenko was simply a manager" for the Yanukovych family. "His biography was clean - simply because he was a young man - and that was why they put him as a front for the family."

### 9.  Kolomoisky (Ninth Actor)

78.     As part of the Criminal Enterprise, Kurchenko would transfer the laundered funds, including Plaintiff's Funds, to his business associate, Kolomoisky and his companies.

### 10.  Boholiubov (Tenth Actor)

79.     Kolomoisky was one of the primary owners of another well-known Ukrainian bank, PrivatBank. Kolomoisky, together with Boholiubov, exercised control over PrivatBank and its activities.

### 11.  Korf (Eleventh Actor)

80.     Korf is a Miami-based business associate of Kolomoisky and Boholiubov. Korf helped to acquire and manage the Ukrainian oligarchs' business empire in the United States and was also a part owner of an affiliate of PrivatBank.

**12. Laber (Twelfth Actor)**

81.     Laber worked in Miami with Korf and Kolomoisky and also serves on the supervisory board of "Ukrnafta," a Ukrainian oil and gas company, in which the Privat Group has a significant share.

**13. Optima Industrial Management, LLC (Thirteenth Actor), Optima International (Fourteenth Actor), Optima Ventures, LLC (Fifteenth Actor)**

82.     Korf and Laber worked with Kolomoisky, and operated through their Miami-based headquarters, Optima Group, to acquire and manage US-based entities as well as real estate investments throughout the United States as part of the Criminal Enterprise. Kolomoisky, Boholiubov, Korf, and Laber, together with other individuals (including Kurchenko) and all with the consent, knowledge of, and complicity of, the officials of NBU, embezzled and converted Plaintiff's Funds in Florida. They accomplished this scheme, by the operations of Optima Group, located in Miami, Florida, and devised a scheme to convert BrokBank and PrivatBank funds, including the Plaintiff's Funds, deposited with and entrusted to the banks, for themselves through false loans to entities owned and controlled by the Criminal Enterprise.

83.     Kurchenko and Kolomoisky frequently cooperated with each other in these movements of funds and conducted the Criminal Enterprise from their headquarters in Miami, Florida, by taking the converted funds and investing them in various ventures as described herein.

84.     In 2014, during the time that BrokBank was placed into liquidation by NBU, Kolomoisky's bank, PrivatBank was also experiencing difficulties largely due to the illegal money laundering operations being carried out by the Criminal Enterprise.

85.     As with BrokBank, NBU and its officials also internally determined and agreed to take control of PrivatBank. During the nationalization process in 2016, NBU and its representatives dealt primarily with Kolomoisky and Boholiubov, who falsely pledged to negotiate

the return the funds to the investors of PrivatBank. However, instead of returning the laundered funds to the investors, Kurchenko, Kolomoisky and Boholiubov devised a scheme to take the bank's funds—money entrusted to it by depositors, including Plaintiff's Funds—for themselves.

86.     Kurchenko, after escaping from Ukraine, continued to actively conspire with Kolomoisky and his companies to convert the funds in BrokBank and PrivatBank, including Plaintiff's Funds. In particular, this is evidenced by numerous telephone conversations, which have been published online (and which Plaintiff has transcribed and translated). In those conversations, Kolomoisky and Kurchenko discussed, among other things:

   a.  How they are running PrivatBank and BrokBank;

   b.  How Kurchenko purchased the controlling interest in BrokBank, and subsequently obtained a stabilization loan (refinancing) from NBU;

   c.  Kurchenko alleged that Kolomoisky's companies were converting funds from PrivatBank, and Kolomoisky admitted this allegation;

   d.  Kurchenko alleges that Kolomoisky has approximately $49 million worth of oil which belongs to Kurchenko's companies, and that Kolomoisky owes Kurchenko's companies approximately $20 million. Kolomoisky has failed and refused to deliver the oil or return the funds to Kurchenko, which has prevented Kurchenko from returning Plaintiff's Funds to BrokBank; and

   e.  A discussion regarding how Kurchenko, through his companies, transferred approximately $40 million to Kolomoisky's companies as a prepayment for the purchase of oil, involving the accounts of the Ukrainian oil and gas company Ukrnafta (a Ukrainian oil and natural gas extracting company) at PrivatBank. The $40 million included Plaintiff's Funds, which were

transferred from Kurchenko to the Miami Parties, who then proceeded to launder the $40 million through the Optima Group companies in Miami, Florida.[18]

### 14. Ukrnafta (Sixteenth Actor)

87. Based on the conversations above, Kolomoisky was able to take advantage of Kurchenko and his status as a wanted person, to convert the oil from Kurchenko, which Kurchenko purchased using laundered funds (including Plaintiff's Funds), through Ukrnafta, which Kolomoisky controlled, for Kolomoisky, NBU, and NBU officials' own benefit. Kolomoisky sold the oil, and used the proceeds (approximately $40 million) to purchase real estate and other assets in the United States.

### 15. PrivatBank (Seventeenth Actor)

88. Thus, the funds (including Plaintiff's Funds) laundered and converted by the Miami Parties included not only those from PrivatBank, but also included those funds converted by the Kurchenko Parties, with the complicity and consent of the NBU officials, from BrokBank. In other words, Kolomoisky used the funds initially converted by Kurchenko (from BrokBank), to purchase real estate and other assets in the United States. These assets are presently the subject of two asset forfeiture proceedings initiated by the U.S. Department of Justice in the Southern District of Florida.[19] As demonstrated in those lawsuits, a substantial part of the events occurred in Miami, Florida, through Kolomoisky, Korf, and Laber and the Optima Group companies, all giving rise to these two parallel federal proceedings.

---

[18] Thus, Kurchenko transferred money (for transportation, processing and storage of oil by Ukrnafta) by paying money to accounts at PrivatBank – the bank controlled by the Miami Parties.

[19] *See* Section VII. 2 below.

## VI. The Investments

89.     As noted in paragraph 6 above, on September 14, 2020, the Investors assigned all of their rights to pursue claims to recover Plaintiff's Funds (together with all other rights to recover the interest, penalties, lost profit, and all compensatory, statutory, punitive, and all other damages and claims in connection with the Funds) to Plaintiff, for good and valuable consideration more specifically set forth in the assignments. *See* Exhibit "A." The principal of the invested Funds is summarized as follows:

### 1. *Zukk Investments*

90.     Pursuant to an Assignment Agreement between Plaintiff and Zukk dated September 14, 2020, Plaintiff was assigned the benefit of the rights of claims arising out of the following agreements which were entered into by Zukk with BrokBank:

  a.   No. 01-07-2010 dated 07.07.2010 for the amount of $15,000,000.00;

  b.   No. 02-07-2010 dated 07.07.2010 for the amount of $15,000,000.00;

  c.   No. 03-07-2010 dated 07.07.2010 for the amount of $15,000,000.00;

  d.   No. 04-07-2010 dated 07.07.2010 for the amount of $15,000,000.00; and

  e.   No. 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 dated October 29, 2012 for the amount of $35,000,000.00.

91.     These investments, totaling the principal sum of $95,000,000.00 are collectively referred to as the "Zukk Investments." A true and correct copy of the agreements underlying the Zukk Investments is attached hereto as **Exhibit "C."**

## 2. *Intertransgroup Investments*

92.     Pursuant to an Assignment Agreement between Plaintiff and Intertransgroup dated September 14, 2020, Plaintiff was assigned the benefit of the rights of claim arising out of the following agreements which were entered into by Intertransgroup with BrokBank:

  a.  Bank deposit agreement No. 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 dated December 27, 2012. This includes deposits in the amount of $1,500,000.00, which were confirmed by payment orders: No. 104 dated December 27, 2012, No. 6 dated January 25, 2013, No. 12 dated February 14, 2013, No. 23 dated March 26, 2013, and No. 115 dated December 26, 2013;

  b.  Bank deposit agreement No. 28-03-2013 dated 03/04/2013 on the placement of funds in the amount of UAH 38,000,000.00, the amount is confirmed by payment order No. 19 dated April 04, 2013;

  c.  Contract No. 22479 dated 02.06.2011 in the amount of UAH 586,880.65;

  d.  Agreement No. 105355 dated November 12, 2012;

  e.  Agreement No. 105354 dated November 12, 2012; and

  f.  Agreement No. KCKP / 20 dated August 12, 2010.

93.     These investments, totaling the USD equivalent of the principal sum of $2,892,705.46 are collectively referred to as the "Intertransgroup Investments." A true and correct copy of the agreements underlying the Intertransgroup Investments is attached hereto as **Exhibit "D."**

## 3. *Kovzel Investment*

94.     Pursuant to an Assignment Agreement between Plaintiff and Mr. Kovzel dated September 14, 2020, Plaintiff was assigned the benefit of the rights of claim arising out of the

following agreement which was entered into by Mr. Kovzel and BrokBank: the Bank deposit agreement No. 323-01-13-840 dated January 11, 2013, totaling $4,185,204.00 in funds invested by Mr. Kovzel into BrokBank (the "Kovzel Investment"). A true and correct copy of the deposit agreement underlying the Kovzel Investment is attached hereto as **Exhibit "E."**

### 4. *Didylivsky Investment*

95.     Pursuant to an Assignment Agreement between Plaintiff and Mr. Didylivsky dated September 14, 2020, Mr. Zhukovskiy was assigned the benefit of the rights of claim arising out of the following agreement which was entered into by Mr. Didylivsky and BrokBank: the Bank deposit agreement No. D_150676669 dated December 23, 2013, totaling $130,000.00 in funds invested by Mr. Didylivsky into BrokBank, at an annual interest of 11.5% (the "Didylivsky Investment"). A true and correct copy of the deposit agreement underlying the Didylivsky Investment is attached hereto as **Exhibit "F."**

## VII.    Relationship among the Actors; working in concert with NBU officials to launder and convert Plaintiff's Funds, and the connections and Nexus Between the Individuals, Companies, and Florida

96.     As discussed herein, the Investors initially deposited over $102 million in principal in BrokBank (some of which later was transferred to PrivatBank). But unbeknownst to them, shortly after making their deposit, Kurchenko together with the Criminal Enterprise with NBU and its officials, devised a plan to create a number of illegal transactions and investments to allow them to divert and convert the Plaintiff's Funds out of BrokBank and PrivatBank to the Criminal Enterprise and to the NBU officials. All of this was done with the knowledge, consent, and participation of NBU through its officials, acting in their official capacity.

31

97.    BrokBank and Real Bank, another bank controlled by Kurchenko, attracted funds in the form of deposits from individuals and legal entities, which were subsequently withdrawn abroad by providing "loans" to fictitious enterprises without proper collateral (pledge).

98.    Thus, Plaintiff's Funds were siphoned from BrokBank, through a vast network of companies, including Real Bank as well as offshore companies controlled by Kurchenko, and then laundered through the Optima Group companies, PrivatBank and other entities, by way of false "loans," as "advance payments" or without any basis for the transfer of funds at all. The funds would be sent through various firms, as financial assistance, payments, or other transfers, to conceal their true source of origin. The funds, including Plaintiff's Funds, were then transferred to offshore companies through front companies by transferring funds (in exchange for, "fuel," for example, – which was related to Kurchenko's companies involved in fuel – or not mentioning any payment purpose or reference for the transaction). Then this "fuel" was supposedly imported into the territory of Ukraine illegally without customs clearance, sold, the funds transferred back to the Criminal Enterprise as "income" and ultimately sent to NBU. However, these transfers were made with laundered funds, a portion thereof consisting of Plaintiff's Funds, and were not "income" received in exchange for the sale of fuel, or resulting from any other legitimate transaction, and NBU and its officials were required to return those converted and laundered funds back to the Plaintiff.

99.    After Kurchenko acquired 80.0273% of shares of BrokBank in 2013, Kurchenko, working with the approval and knowledge and consent of NBU, took actions to misappropriate BrokBank and PrivatBank funds, which funds included Plaintiff's Funds, which ultimately led to the insolvency of BrokBank and its subsequent liquidation.

100.    NBU's officials were complicit in the wrongful scheme to divert, convert, and otherwise wrongfully take, funds from BrokBank to NBU and to other third parties including the Criminal Enterprise. In addition to being complicit in the plan to embezzle funds from the Plaintiff and others, NBU was grossly negligent in exercising its supervising obligations of BrokBank and PrivatBank, and instead conspired with Kurchenko to improperly and illegally withdraw and convert funds from BrokBank and PrivatBank before the liquidation process was complete, to the detriment of its creditors.

101.    In connection with Kurchenko's wrongful actions, the Podolsk District Court of Kiev issued a verdict in criminal case No. 758/15964/17, wherein the court found that Kurchenko organized and headed a criminal organization with the aim of committing especially egregious crimes, including crimes against state property.

102.    In addition, other money laundering activities occurred by way of fraudulent loans involving Kurchenko's companies, which were improperly repaid with the BrokBank funds, but this was just another method to transfer money out of the BrokBank and to convert Plaintiff's Funds. Similarly, Kurchenko's coconspirators transferred BrokBank funds to the other bank controlled by Kurchenko, Real Bank, to convert Plaintiff's Funds.

103.    As a result of several investigations related to the schemes perpetrated by Kurchenko and his companies, in January 2018, the Kramatorsk District Court of the Donetsk Region issued a ruling (in a case which was initiated on March 28, 2017), that funds in excess of $2.25 billion were misappropriated by a group of individuals associated with the former Ukrainian President Yanukovych, which included in particular, Kurchenko, under whose management funds were misappropriated from BrokBank.

33

104.     Thereafter, the Court confiscated the $2.25 billion in funds from the Criminal Enterprise, and redistributed those funds to various entities, including Plaintiff's Funds from BrokBank. NBU received in excess of $172 million of those funds. Although Plaintiff's Funds rightfully belonged to the Investors and NBU was required to use those funds to repay the Investors who were owed money for their deposits and investments in BrokBank. NBU, instead, used those funds, including Plaintiff's Funds, for its own benefit instead of returning the funds to the rightful owners (including Plaintiff), those that held their funds in BrokBank.

1.  **BrokBank Declared Insolvent**

105.     On February 11, 2014, BrokBank customers lined up outside branches across Ukraine to withdraw funds, because bank cards were no longer working at ATMs. However, BrokBank quickly denied any problems. It initially falsely claimed that there were "issues" with payments and alleged this was solely due to a switch from the VISA payment system to the MasterCard Worldwide payments system.

106.     On February 28, 2014, BrokBank was declared insolvent by the NBU Board. As a result, the Investors, and many other depositors of the Bank, were forced to submit certain claims to the Executive Directorate of the Individual Deposits Guarantee Fund (the "IDG Fund") for recognition as part of the liquidation process.

107.     Although the Investors' investments were recognized by the IDG Fund, the Investors' funds were not returned because the funds were already illegally funneled out of BrokBank, pursuant to the Criminal Enterprise led by Kurchenko, with the assistance of the NBU officials (including Arbuzov and Sorkin), and others.

108.     Initially, the Investors' deposits were recognized by BrokBank during the insolvency process. However, once the insolvency was concluded, the Investors discovered that their Funds were actually converted and stolen by Kurchenko, with the assistance of NBU officials,

34

including Arbuzov, and were laundered through companies in the United States, including but not limited to Optima Group, operating out of its headquarters in Miami, Florida. Ultimately, the Investors' Funds were converted by the Kurchenko Parties and transferred to NBU officials, including Arbuzov, for their own personal use and benefit.

109.    Thereafter, Ukraine seized the funds of Kurchenko, Kolomoisky and others, which amount was in excess of $172 million, and transferred those seized funds to NBU. However, instead of transferring the seized funds to BrokBank for repayment to its creditors, NBU used the seized laundered Investors' funds for NBU's own benefit.

110.    The principal value of the Investors' deposits at BrokBank were initially confirmed by the Fund administering the liquidation of BrokBank, and the Investors were led to believe that Plaintiff's Funds, together with all applicable interest, and compensatory and statutory damages, would be returned to them upon completion of the liquidation of BrokBank. The Investors' claims were recognized as follows:

a.    As set forth in the November 6, 2014 letter from BrokBank (No. 10898 / 010-04), on October 16, 2014, by Decision No. 226/14, Zukk's monetary investments in BrokBank were recognized and accepted as claims by the Fund.

b.    As accepted by the Fund, Zukk's investments totaled UAH 1,141,957,338.19. The principal value of Intertransgroup investments were recognized and accepted, totaling UAH 56,640,150.23. These investments were recognized by a letter from BrokBank dated September 9, 2015, No. 7/35-zkr.

c.    The principal value of Mr. Kovzel's investments were recognized and accepted, totaling UAH 53,277,679.50. These investments were recognized by a letter from BrokBank dated October 28, 2014, No. 4/3670-kr.

    d. The principal value of Mr. Didylivsky's investments were recognized and accepted, totaling UAH 1,298,102.37. This is evidenced by an extract from the list (register) of creditors' claims of BrokBank dated October 16, 2014, No. 226/14.

111.    Although the Investors submitted claims to the Fund as part of the liquidation process of BrokBank, and although the Investors were led to believe that they could obtain the return of their Funds from NBU[20] together with appropriate interest, costs, and fees, the Investors' claims remained unsatisfied and have been denied, which was confirmed by letters from the Fund. This denial was evidenced by the following letters received from the Fund:

    a. Letter No. 27-18981/19 dated November 11, 2019 confirmed that the Zukk Investments would not be returned;

    b. Letter No. 35-20863/19 dated December 10, 2019 confirmed that the Intertransgroup Investments would not be returned;

    c. Letter No. 27-18980/19 dated November 4, 2019 confirmed that the Kovzel Investment would not be returned; and

    d. Letter No. 35-036-20890/19 dated December 10, 2019 confirmed the Didylivsky Investment would not be returned.

**2.  Kurchenko, Kolomoisky, and the Florida Companies, with the Help and Participation of NBU, Funnel Plaintiff's Funds out of BrokBank**

112.    It has now been discovered that the funds converted from BrokBank were laundered through the companies, including PrivatBank, Optima Group and other individuals, with the

---

[20] Pursuant to the Resolutions of the Ukrainian Administrative Court in Case No. 826/19469/14, NBU as a state body is subject to liability for its handling of the Brokbusinessbank liquidation and the funds to be repaid to creditors of Brokbusinessbank.

knowledge and consent of NBU, operating out of Miami, Florida, owned and controlled by the Miami Parties, including Korf and Laber, who were operating out of Miami, Florida.

113. On August 6, 2020, the U.S. Department of Justice filed two cases in this District for *in rem* forfeiture of assets that facilitated, were involved in, and are traceable to an international conspiracy to launder money embezzled and fraudulently obtained from PrivatBank. The first is the case styled as *United States of America vs. All Right to and Interest in PNC Corporate Plaza Holdings LLC, etc., et al.*, Case No. 1:20-cv-23279-XXXX. The second is the case styled as *United States of America vs. Real Property Located at 7505 and 7171 Forest Lane, etc., et al.*, Case No. 1:20-cv-23278-XXXX.

114. In the complaints filed in each of these cases (collectively, the "Forfeiture Complaints"), the United States seeks forfeiture related to "several of the entities involved in the criminal activity having a principal place of business in Miami" in connection with PrivatBank which is "a Ukrainian financial institution located in Ukraine, with a branch in Cyprus and an affiliated entity in Latvia, among other places." Like BrokBank, PrivatBank was one of the largest banks in Ukraine. Like BrokBank, as a result of a "scheme by the bank's owners to steal" billions from the bank due to issuance of fraudulent loans, "[a]s a result of the massive theft and fraud, PrivatBank was nationalized in December 2016." *See PNC Corporate* Compl. at ¶¶ 1, 11.

115. The history of the siphoning of funds from PrivatBank and the extraction of funds from BrokBank are interconnected. As discussed in the Complaint in the *PNC Corporate* matter, "Kolomoisky is a billionaire Ukrainian oligarch. He controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media, under the umbrella of the "Privat Group." Before the nationalization of PrivatBank, he was one of the two primary owners of the bank, holding more than 40% of the bank's shares, and was a member of the bank's Supervisory

Board. He [together with Gennadiy Boholiubov] exercised extensive control over the bank and its activities." *Id.* at ¶¶ 12, 13.

116. Korf is a "Miami-based business associate of Kolomoisky and Boholiubov. He helped to acquire and manage the Ukrainian oligarchs' business empire in the United States, which included ferroalloy companies and real estate holdings in Ohio, Florida, Kentucky, and West Virginia. Along with Kolomoisky and Boholiubov, Korf was a part owner of dozens of U.S. entities, for which he often acted as President and CEO . . . Korf was also a part owner of PrivatBank's Latvia affiliate." *Id.* at ¶ 13.

117. Laber worked with Korf and Kolomoisky and also "serves on the supervisory board of Ukrnafta, a Ukrainian oil and gas company, in which Privat Group has a significant share. Like Korf, Laber was a part owner of PrivatBank's Latvia affiliate." *Id.* at ¶ 14.

118. Korf and Laber worked with Kolomoisky, and operated the Criminal Enterprise through their Miami-based headquarters through the Optima Group based at Suite 5500 at the Southeast Financial Center tower in Downtown Miami, 200 South Biscayne Boulevard, Miami, Florida. They operated through associates including Korf and Laber, who worked to acquire and manage US-based entities for Kolomoisky under the "Optima" umbrella of companies. *See id.* at ¶¶ 14, 15. As discussed in the Forfeiture Complaints, it is alleged that Kolomoisky laundered money in the United States, through a network of companies, under some variation of the name "Optima," to acquire businesses in real estate in the United States using misappropriated funds. *See id.* at ¶¶ 17-22.

119. Kolomoisky, Boholiubov, Korf, and Laber, together with other individuals, including Kurchenko, and with the consent, knowledge of, and complicity of, the officials of NBU,

converted and embezzled money in Florida, and devised a scheme in Florida to take BrokBank and PrivatBank funds for themselves.

120. This scheme was done through false loans (which were never intended by the Criminal Enterprise to be repaid) to entities owned and controlled by Kolomoisky and Boholiubov, "which allowed them to take the money to use as they wanted, without restriction, and hid the misuse of funds from regulators, depositors, auditors and others." *See id.* at ¶¶ 36-66. They "laundered the money by investing in the United States", which monies included Plaintiff's Funds, by purchasing "more than five million square feet of commercial real estate in Ohio, steel plants in Kentucky, West Virginia and Michigan, a cellphone manufacturing plant in Illinois, and commercial real estate in Texas." *See id.* at ¶¶ 19, 20.

121. The money used to purchase real estate and other assets in the United States, "was the proceeds of embezzlement, misappropriation, and fraud" and was "directly traceable" to loans obtained from PrivatBank by Kolomoisky and Boholiubov. Kolomoisky and Boholiubov founded PrivatBank in 1992. By 2008, and through 2016, each owned roughly 45% of PrivatBank. To control the bank's daily activities, Kolomoisky and Boholiubov installed loyal associates to head the management of PrivatBank. *See id.* at ¶¶ 22-30.

122. In 2014, around the time that BrokBank was placed into liquidation by NBU, PrivatBank was also experiencing financial troubles. In April 2014, Moody's Investors Service, a provider of credit ratings, research, and risk analysis, downgraded the ratings of PrivatBank and eleven other Ukrainian banks. Like BrokBank, NBU had decided to take control of PrivatBank, and during the nationalization process in 2016, NBU and its representatives dealt primarily with Kolomoisky and Boholiubov in negotiating the terms of the agreement. *See id.* at ¶ 31.

123.    Thus, the Miami Parties laundered funds including those funds converted from PrivatBank, as well as the funds converted by the Kurchenko Parties from BrokBank, which includes the Plaintiff's Funds. All of this was done, through the individuals and companies operating out of Miami, Florida, with with the, knowledge, consent, and complicity of NBU, and its officials.

124.    The funds, including Plaintiff's Funds were converted through, among other things, the issuance of false "loans" to parties related to the Kurchenko Parties and the Miami Parties. The purpose of these loan applications was fraudulent, and they were frequently repaid with proceeds of other loans. As set forth in the Forfeiture Complaints, "[o]nce the funds were taken from PrivatBank, they were transferred quickly among dozens of the shell entities, often in a matter of minutes. The Cyprus branch of PrivatBank was used as a washing machine for the stolen loan funds." *See id* at ¶ 79.

125.    As an example of the money laundering, "Korf and Laber used the Optima Family's funds as one large pool of money. They transferred funds back and forth between the different entities, both to launder the money and to try to make money—that is why, for instance, a manganese ore importer paid for the restructuring of a commercial real estate building in Kentucky. Korf discussed those transfers with Kolomoisky and Boholiubov, and they approved the use of the money . . . The transactions allowed Kolomoisky, Boholiubov, Korf, and Laber to launder the money, to promote the continued misappropriation of funds from PrivatBank, and to disguise the ownership, nature, and source of funds." *Id.* at ¶¶ 87, 91.

126.    The misappropriation of funds, and the "slush fund" pool of money siphoned from PrivatBank was not limited to just those funds, but also, involved Kurchenko, and the Plaintiff's Funds converted from BrokBank. This occurred, and could only have occurred as a direct result

40

of the complicity and consent of NBU through the intentional actions and inactions of NBU and its officials. As a result, millions of dollars, including Plaintiff's Funds, were converted from BrokBank, transferred and laundered, with the knowledge, consent, and approval of NBU and its officials, through the misconduct of the Criminal Enterprise in the United States, and in particular, in Miami, Florida.

127. The fact that Plaintiff's Funds were laundered by the Kurchenko Parties together with the Miami Parties is evidenced by the fact that Kurchenko and Kolomoisky frequently acted together in their wrongdoing and money laundering scheme. For example, as set forth in the decision of the Kramatorsk District Court of the Donetsk region dated March 28, 2017, during 2011-2013 Kolomoisky's PrivatBank (Latvia) carried out transactions between a number of sham companies in favor of Kurchenko and the entourage of Ukraine's ex-President Viktor Yanukovich. In particular, the scheme involved the company "Quickpace Limited," another one of Kurchenko's companies through which Kurchenko and his coconspirators carried out a number of money laundering and sham transactions.

128. The court has established that this was an integral part of the schemes for the withdrawal and legalization of funds obtained by criminal means. During 2011-2013, several hundred million dollars, including Plaintiff's Funds, passed through Quickpace Limited's accounts in the Latvian PrivatBank. The funds, including Plaintiff's Funds, were transferred and received under the guise of loans being issued and falsely repaid (in a classic money-laundering scheme fashion). The majority owners and ultimate beneficiaries of the Latvian PrivatBank at the time were Kolomoisky, Boholiubov, Korf, and Laber.

129. The key element of this scheme was the intermediary bank which was selected, through which the transactions took place, and which was responsible for checking the legality of

funds before transferring funds. The intermediary bank, PrivatBank (Latvia), carried out payment orders of Kurchenko's company Quickpace Limited, including for example, issuance of a "loan" from a company from Belize for $10 million, to repay interest on a "loan" to a Cypriot company for $289,000.00.

130. In January 2018, it was reported that an investigation by Kroll (a company that provides consulting services and investigates cases of fraud, bribery, and corruption) that before the nationalization of PrivatBank, there had been large-scale and coordinated fraudulent actions, resulting in losses of at least $5.5 billion. These actions included: siphoning off funds; actions of the bank owners in hiding the source of funds; and fraudulent loans, which were used to create the impression that it was a normal bank, whereas large sums of money were being withdrawn from the bank.

131. In December 2015, after the aforementioned operations, PrivatBank Latvia was fined 2 million euros for violating European anti-money laundering legislation. PrivatBank also sued Kolomoisky in the United Kingdom, and in a decision issued on April 6, 2020, the United Kingdom Supreme Court decided that a $3 billion claim by Ukraine's largest lender PrivatBank against its former owners can be heard in a court in London. The London court concluded PrivatBank had a "good arguable case" to recover $1.9 billion, or $3 billion including interest, PrivatBank reportedly said in a public statement. Plaintiff's Funds are among those funds in PrivatBank which were part of the money laundering scheme.

132. The history of the siphoning of funds from PrivatBank and the extraction of funds from BrokBank are not only similar, but are interconnected, because the two oligarchs (Kolomoisky and Kurchenko) are connected, and formed part of the same Criminal Enterprise, which converted funds, including those from BrokBank, with the complicity and actions and

inactions of NBU and its officials. In fact, after PrivatBank was nationalized, as of December 19, 2017, it was reported that more than 400 lawsuits were filed against NBU and the Ministry of Finance of Ukraine, in connection with their wrongful actions in connection with the money laundering (and subsequent liquidation of the bank) which occurred.

133.    The strong ties between the two oligarchs are also evidenced by the fact that Kolomoisky's confidant was in charge of another Kurchenko company, Sabulong Trading Ltd, which was involved in the Kramatorsk Court decision in Ukraine wherein the Court seized in excess of $2.25 billion in 2017, which included Plaintiff's Funds.

134.    Plaintiff has reason to believe that the entities involved in the criminal activity operating out of its headquarters in Miami, Florida in connection with PrivatBank, and the Miami Parties, were also involved in, and actively participated in the illicit transfer of funds, including Plaintiff's Funds by the Criminal Enterprise, together with the participation, knowledge, complicity, consent, and assistance of NBU and its officials.

### 3. NBU's Participation in the Theft of Funds from BrokBank Is Recognized by Ukrainian Court Decisions

135.    A number of Ukrainian court decisions, have recognized NBU's misconduct as unlawful. For example, NBU's failure to respond to violations established during its inspections of BrokBank were recognized in Case No. 826/19469/14 which was a case initiated by Eurotranskom Limited Liability Company against NBU.

136.    In the *Eurotranskom* matter, the court determined that NBU's actions during the period from July 1, 2011 to February 28, 2014 were deemed illegal due to its failure to apply the appropriate measures to ensure the protection of the interests of the depositors and creditors, and the security of the funds in the bank accounts of BrokBank.

43

137.     NBU's wrongful actions as determined in the *Eurotranskom* case, are consistent with NBU officials' participation in the theft of Funds, including Plaintiff's Funds, from BrokBank by Kurchenko and his criminal group of companies.

138.     NBU's wrongful actions in connection with funds being stolen from BrokBank, were also confirmed in Case NO. 826/25896/15, where the court found that during the time period from October 2013 to February 2015, NBU failed to take the necessary measures of control in order to prevent the clear violations of banking rules and regulations and to restore the solvency and financial stability of BrokBank. As a result, BrokBank was forced into liquidation.

139.     While BrokBank was in liquidation, funds were secretly funneled out of BrokBank through improper repayments of "obligations" and "loans" which were false and improper, and in reality, those funds were transferred and laundered through a series of illicit companies, including those in Florida.

140.     In the Case No. 826/25896/15, the Kiev Administrative Court of Appeal confirmed that NBU was required to take proper measures to prevent the wrongful conduct from taking place at BrokBank, and found that NBU had failed to take those measures. This appellate decision confirms that if NBU was required to take actions to prevent the illicit money transfers, and failed to take the necessary actions.

141.     In another case, No. 910/8552/14, the Arbitration Court of Kiev issued a decision regarding an illegal process by which BrokBank because the owner of approximately UAH 2 billion of internal government bonds (issued by the Ministry of Finance of Ukraine), through illegal financial operations which occurred at night. The transfers were made in "manual" mode in order to manipulate restrictions on transfers of the funds from BrokBank. As a result, in this case, there was a financial fraud, which was conducted with the participation of NBU, in connection

44

with invalid contracts for the sale and purchase of domestic government bonds (with the Agrarian Fund company), which was established by the verdict of the Kramatorsk city district court of the Donetsk region, dated March 8, 2017, in Case No. 234/4135/17.

### 4. Investors Discover the Theft of Their Funds and NBU's Wrongful Use of Plaintiff's Funds

142.    The Investors learned that funds in the amount of $172,779,191.16 were transferred directly to NBU.[21]

143.    The funds confiscated by the State of Ukraine and part of which were transferred to NBU, included funds which were embezzled by Kurchenko and his criminal organization from BrokBank, including the Plaintiff's Funds.

144.    Although NBU received over $172 million, these funds were not used to pay back the BrokBank creditors, including the Plaintiff. Instead, these funds were unreasonably withheld by NBU, and used for other purposes, including the payment of interest on Ukrainian government bonds, including those issued to United States investors, such as Franklin Templeton, T. Rowe Price, and TCW Group.

145.    In January 2015, the Ukrainian State Financial Monitoring Service blocked the accounts of foreign companies associated with former President Yanukovych, his relatives, and officials of the former Ukrainian government and other persons associated with them. The State Financial Monitoring Service of Ukraine reportedly stated that Yanukovych and his entourage may have carried out illegal financial transactions involving money laundering and other crimes, in the amount of approximately $200 billion.

---

[21] Through transfers which were made from April 28, 2017 through December 21, 2017, via account No. XXXX1595, which was opened in the name of the Treasury of Ukraine at Oschadbank OJSC.

**5. Plaintiff Demands Return of Plaintiff's Funds and Related Damages**

146.    Plaintiff, as the assignee, has demanded NBU return the principal value of Plaintiff's Funds, together with the interest, lost profit, statutory damages, and other damages in connection with the Zukk Investments, the Intertransgroup Investments, the Kovzel Investment, and the Didylivsky Investment. *See, e.g.,* Demand Letter to NBU, Exhibit "B."

147.    To date, NBU has failed and refused to return the Investors' Funds, or the interest, penalties, and other damages the Investors incurred as a result of the theft of their funds. As such, the Investors have incurred compensatory and statutory damages in excess of $300 million while NBU has received a windfall of over $300 million in value from its harmful and improper conduct, in particular here of its wrongful participation in the funneling of Plaintiff's Funds out of BrokBank by the Criminal Enterprise, with the help, knowledge, consent, and participation of NBU and its officials, and occurring in large part, in Miami, Florida.

148.    As a result of the NBU's wrongful actions and conduct, Plaintiff engaged Shutts & Bowen LLP to represent it in this action and has agreed to pay the firm its reasonable attorneys' fees. Plaintiff is entitled to receive attorney's fees pursuant to applicable law including Florida and Ukrainian law.

149.    All conditions precedent to the bringing of this action have been performed by Plaintiff or have occurred.

## COUNT I – CONVERSION

150.    Plaintiff reaffirms and re-alleges paragraphs 1 through 149 above with the same force and effect as if fully set forth herein.

151.    NBU has intentionally converted to its own use Plaintiff's Funds during the period from July 18, 2013 to the present, totaling over 300 million in value. This is an action for conversion against Defendant, NBU.

46

152.   NBU has converted to its own use Plaintiff's Funds totaling over $102 million in principal value, together with all applicable interest on the converted funds, which are the property of Plaintiff.

153.   The Investors have demanded that Defendant return Plaintiff's Funds, including by letters, emails, and phone calls, over the past several years. Plaintiff also sent a demand letter to NBU seeking return of Plaintiff's Funds, together with all applicable interest, and other damages. *See* Exhibit "B."

154.   Plaintiff has an immediate right to the possession of Plaintiff's Funds, which it had demanded from Defendant.

155.   Despite Plaintiff's (and the Investors') demands, Defendant has failed and refused to return and has wrongfully and illegally retained Plaintiff's Funds.

156.   Defendant wrongfully exercised dominion and control over Plaintiff's Funds, despite Defendant not having any legal right to Plaintiff's Funds.

157.   As a direct and proximate result of Defendant's conversion, Plaintiff has suffered damages, including, but not limited to, the value of Plaintiff's Funds, interest, statutory interest, lost profits, loss of use of Plaintiff's funds, attorney's fees, costs, as well as other damages sustained.

**WHEREFORE**, Plaintiff, demands judgment against Defendant, the National Bank of Ukraine, for damages, plus interest, together with late fees, court costs, and attorney's fees as permitted under applicable law, and for such other and further relief as this Court deems just and proper.

47

## COUNT II – UNJUST ENRICHMENT

158.    Plaintiff reaffirms and re-alleges paragraphs 1 through 149 above with the same force and effect as if fully set forth herein.

159.    NBU wrongfully retained Plaintiff's Funds from July 18, 2013 through the present, without providing any compensation to Plaintiff or the Investors. If NBU is permitted to retain the benefit of Plaintiff's Funds, NBU would be unjustly enriched should it be allowed to retain these funds and withhold payment to Plaintiff.

160.    NBU appreciated the benefits of having Plaintiff's Funds without providing any compensation to the Investors or the Plaintiff for such benefits.

161.    Under the circumstances, it would be inequitable for NBU to retain the benefit conferred without paying the fair and reasonable value thereof.

162.    Plaintiff has no adequate remedy at law.

163.    As a proximate result of NBU's wrongful acts, omissions, and misconduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands judgment for damages against NBU for unjust enrichment, including compensatory damages, prejudgment interest, costs, attorney's fees as permitted under applicable law, and all such other relief this Court deems just, fair, and equitable.

## COUNT III – FRAUD

164.    Plaintiff reaffirms and re-alleges paragraphs 1 through 149 above with the same force and effect as if fully set forth herein.

165.    Between at least 2013 and 2019, NBU, through its officials, permitted the Criminal Enterprise, including the Kurchenko Parties, to embezzle more than $300 million (including the principal value, interest, and other damages), from the Investors. NBU then received the embezzled

funds when they were seized pursuant to the Kramatorsk Court order knowing the seized funds belonged to the investors and the Plaintiff. NBU then, in derogation and disregard of the Plaintiff's rights, unlawfully diverted and used Plaintiff's Funds for NBU's own purposes, instead of returning those funds to the Investors or to the Plaintiff.

166.    NBU knowingly concealed the embezzlement and fraud from the Investors, by "recognizing" the Investors' claims to the Funds, falsely represented to the Plaintiff that they would conduct the liquidation of BrokBank and disburse the proceeds to the investors and return the funds. However, NBU failed to disclose that NBU never intended to return Plaintiff's Funds, and instead intended to keep the embezzled Funds for itself.

167.    By these actions, NBU and its officials, acting in their official capacity, committed fraud by knowingly making material misstatements of fact and/or omissions (including, but not limited to, representing that they would conduct the liquidation appropriately, and that they would disburse the funds, including the Plaintiff's Funds, to the deposit-holders, including the Investors) with an intent to mislead the Investors.

168.    The Investors reasonably relied on those material misstatements and/or omissions by NBU, which resulted in damage to the Investors and to the Plaintiff.

169.    As a proximate result of NBU's fraudulent acts, omissions, and misconduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, demands judgment against Defendant, the National Bank of Ukraine, for damages, plus interest, together with late fees, court costs, and attorney's fees as permitted under applicable law, and for such other and further relief as this Court deems just and proper.

## COUNT IV – CONSPIRACY TO COMMIT FRAUD

170. Plaintiff reaffirms and re-alleges paragraphs 1 through 149 above with the same force and effect as if fully set forth herein.

171. From at least 2013 through 2020, NBU through its officials agreed, and conspired, acting in concert with the Criminal Enterprise to embezzle more than $300 million-worth of funds (including the principal value, interest, and other damages), from the Investors.

172. NBU then received the embezzled funds when they were seized pursuant to the Kramatorsk Court order. NBU then unlawfully diverted and used Plaintiff's Funds for NBU's own purposes, instead of returning those funds to the Investors or to the Plaintiff. NBU knowingly concealed the embezzlement and fraud from the Investors, by, among other things: (i) "recognizing" the Investors' claims to the Funds, (ii) agreeing to complete the liquidation and disburse the funds to the deposit-holders, including the Investors, (iii) proceeding with the liquidation of the Bank in bad faith, and (iv) failing to disclose that NBU never intended to disburse the funds and intended instead to keep the embezzled funds for itself.

173. The fraud continued from the time the funds were initially unlawfully siphoned from the Bank by the Kurchenko Parties (with the consent, permission, and knowledge of NBU officials, acting in their official capacity), through the time NBU received the seized funds, and then conducted the "liquidation" of the Bank, which was ultimately concluded in October 2019, without NBU returning the Investors' Funds or the interest and other damages to which the Investors are entitled.

174. By committing these overt acts, NBU and its officials, acting in their official capacity, conspired to commit fraud, as part of a criminal enterprise, to embezzle and unlawfully transfer and use Funds belonging to the Investors.

50

175.    As a proximate result of NBU's fraudulent acts, omissions, and misconduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, demands judgment against Defendant, the National Bank of Ukraine, for damages, plus interest, together with late fees, court costs, and attorney's fees as permitted under applicable law, and for such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated: January 4, 2021.                    Respectfully submitted,

                                          SHUTTS & BOWEN LLP
                                          200 S. Biscayne Boulevard
                                          Suite 4100
                                          Miami, Florida 33131
                                          Tel.: (305) 358-6300
                                          Fax: (305) 381-9982

                                          By: */s/ Harold E. Patricoff*
                                              Harold E. Patricoff, Fla. Bar No. 508357
                                              hpatricoff@shutts.com
                                              Aleksey Shtivelman, Fla. Bar No. 99159
                                              ashtivelman@shutts.com
                                              *Attorneys for Plaintiff*

MIADOCS 21311228 14

51

## ОКРУЖНИЙ СУД СПОЛУЧЕНИХ ШТАТІВ АМЕРИКИ
## ПІВДЕННОГО ОКРУГУ ШТАТУ ФЛОРИДА

### СПРАВА №:

Олег Жуковський,

       Позивач,

проти

Національний банк України,

       Відповідач.

_____/

### ПОЗОВ

    Позивач Олег Жуковський (далі "Позивач" або "пан Жуковський") подає позов до Відповідача Національного банку України (далі "Відповідач" або "НБУ") і стверджує наступне:

### I. ПРЕДМЕТ ПОЗОВУ

    1.    Цей позов виникає внаслідок незаконного відмивання та неправомірного вилучення банківських коштів злочинною групою в Україні та США (далі "Злочинне підприємство"[1]), що дозволило НБУ та його посадовим особам брати участь у розробленій схемі з метою (i) неправомірного отримання контролю над банком під назвою ПАТ "Брокбізнесбанк" (далі "Брокбізнесбанк" або "БрокБанк"), та (ii) вилучення з БрокБанку вкладів фізичних осіб та компаній, у тому числі, зокрема, тих, що знаходяться в м.Майамі,

---

[1] Злочинне підприємство включає таких фізичних та юридичних осіб, які більш докладно обговорюються нижче, у тому числі їх взаємозв'язок та відношення до розкрадання Коштів Позивача, а також ті дії та діяльність, що відбуваються в м.Майамі, штат Флорида: (1) Брокбізнесбанк; (2) Сергій Арбузов; (3) Віктор Янукович; (4) Ігор Соркін; (5) Валерія Гонтарева; (6) НБУ; (7) Сергій Курченко; (8) Реал Банк; (9) Ігор Коломойський; (10) Геннадій Боголюбов; (11) Мордехай Корф; (12) Уріел Лейбер; (13) Optima Industrial Management, LLC; (14) Optima International; (15) Optima Ventures, LLC; (16) Укрнафта; (17) ПриватБанк та кожна їх філій, агентів та пов'язаних компаній.

штат Флорида, та (iii) використання тих коштів для відмивання грошей, частина яких була виведена та перерахована до та через різні організації, зокрема, ПАТ КБ "ПриватБанк" (далі "ПриватБанк"), на шкоду вкладникам БрокБанку. Як зазначено нижче, це було зроблено з відому, за згодою та допомогою (шляхом дій та бездіяльності) НБУ та його посадових осіб для отримання користі та вигоди НБУ та його посадовими особами. У 2013, посадові особи НБУ дозволили Злочинному підприємству неналежним чином "купити" та отримати контроль над БрокБанком, а потім дозволили вивести та відмити резерви БрокБанку за допомогою грандіозної схеми, що здійснювалось різними фізичними та юридичними особами (у тому числі Злочинним підприємством) для маніпулювання, відмивання та виведення Коштів Позивача через рахунки, нерухомість, компанії та фізичних осіб по всій території США (у тому числі, зокрема, операції з відмивання грошей, що здійснювались в м.Майамі, штат Флорида).

2.  Позивач є правонаступником усіх законних прав на задоволення юридичних вимог щодо відшкодування збитків, пов'язаних з певними депозитами, які Відповідач незаконно привласнив, що обговорюється нижче, у тому числі збитків у розмірі понад 300 мільйонів доларів США[2]. Ці депозити та збитки загалом складають понад 102 мільйони доларів США, разом з відсотками, пенею, упущеною вигодою, а також компенсаційними, статутними, штрафними та всіма іншими збитками та претензіями у зв'язку з коштами (разом "Кошти" або "Кошти Позивача"). Кошти, депоновані в БрокБанку, були власністю двох компаній: ZUKK Trading Limited (далі "Zukk") та ТОВ "Інтертрансгруп" (далі "Інтертранс"); та двох фізичних осіб, Миколи Ковзеля (далі "Пан Ковзель") та Віталія Дідилівського (далі "Пан Дідилівський") (разом "Інвестори" або "Цеденти"). 14 вересня

---

[2] Усі посилання на "$" у цьому листі стосуються доларів США, якщо не вказано інше.

2

2020 року Інвестори передали Позивачу всі законні права щодо вкладених коштів з метою їх стягнення, що включає права на надання підстав для подання позову, передбачених в цьому документі (далі "Доручення"). Точні та правильні копії завдань, разом із засвідченими перекладами з англійської мови, додаються до цього документа як **Додаток "А."**

3.     Після того, як кошти були виведені та перераховані з БрокБанку, Україна (через Прокуратуру) порушила карну справу проти кількох фізичних осіб, причетних до злочинної схеми, та арештувала понад 2,25 млрд. доларів США у підприємства. Потім Україна перевела в НБУ понад 172 мільйони доларів США, але НБУ не повернув вкладникам БрокБанку, у тому числі Цедентам Позивача, неправомірно забрані у них кошти. Натомість НБУ неправомірно утримував кошти для Злочинного підприємства, і для НБУ та його посадових осіб, та використовував кошти БрокБанку (які належали фізичним особам та компаніям) для погашення відсотків за державним боргом України (далі "Облігації"), у тому числі, зокрема, для погашення відсотків американським компаніям, у тому числі Franklin Templeton Investments (далі "Franklin Templeton"), T. Rowe Price, та TCW Group (разом "Взаємні фонди у США"), що володіють Облігаціями, багато з яких знаходяться, здійснюють комерційну діяльність та зареєстровані у штаті Флорида.

4.     Таким чином, НБУ завдяки своїм посадовим особам, керівництву, та Злочинному підприємству, успішно створив схему незаконного відмивання грошей. Кошти Позивача були виведені з БрокБанку, а потім відмиті через компанії у Флориді, потім конфісковані Україною, та направлені в НБУ. Зіткнувшись із тиском власників українських державних облігацій (у тому числі Взаємних фондів у США), НБУ вирішив використати Кошти Позивача для сплати відсотків за державними облігаціями у Флориді, замість

повернення Кошти Позивача вкладникам, у тому числі Цедентам Позивача (разом із відповідними відсотками, штрафами та іншими збитками). Як результат, ці Кошти залишаються такими, що повинні бути сплачені та заборгованими, із усіма відповідними відсотками, штрафами та іншими збитками.

5.     У цій справі Позивач вимагає відшкодування збитків на суму понад 300 млн. доларів США, а також таких інших та подальших засобів захисту та санкцій, які може призначити Суд.

## II.  СТОРОНИ, ЮРИСДИКЦІЯ ТА МІСЦЕ РОЗГЛЯДУ СПРАВИ

6.     Позивач, пан Жуковський, є постійним резидентом США, який проживає в США та який є правонаступником усіх законних прав на задоволення юридичних вимог щодо повернення депозитів та збитків, пов'язаних з Коштами Позивача, привласненими НБУ, та всіх інших законних прав на задоволення вимог до Відповідача. *Див.* **Додаток "A."** Як зазначалося, метою Доручень була передача права на задоволення всіх законних вимог Позивачу, щоб він міг домагатися виконання цих вимог від імені Цедентів у США та за кордоном. Серед доручених та переданих прав були права на надання підстав для подання позову, передбачених в цьому документі. Відповідач був письмово повідомлений про доручення листом-вимогою від 29 жовтня 2020 року ("Лист-вимога від 29 жовтня 2020 року"). *Див.* **Додаток "B."**

7.     Відповідач є "агентством сприяння іноземної держави " у значенні згідно 28 U.S.C. § 1603(b), і тому є "іноземною державою" згідно § 1603(a).

8.     Цей суд має юрисдикцію з цієї причини згідно 28 U.S.C. § 1330(a), що передбачає, що "[t]окружні суди мають первинну юрисдикцію, не враховуючи суми в суперечці будь-якого цивільного позову проти іноземної держави, який не підлягає

розгляду в суді присяжних" у значенні 28 U.S.C. § 1603(a). Відповідно, цей Суд має юрисдикцію над НБУ згідно 28 U.S.C. § 1330(a) та 28 U.S.C. § 1603. Цей Суд також має юрисдикцію щодо цього цивільного позову згідно 28 U.S.C. § 1331, в тому, що Позивач заявляє про порушення федерального закону, а саме відмивання коштів згідно 18 U.S.C. § 1956 (b).

9.     Відповідач не має імунітету щодо юрисдикції цього Суду у цій справі згідно Закону про іноземний суверенний імунітет (FSIA), 28 U.S.C. § 1604, згідно (і) 28 U.S.C. § 1605(a)(2) та (ii) 28 U.S.C. § 1605 (a ) (5).

a.     Комерційна діяльність, що є винятком з правил про імунітет згідно 28 U.S.C. § 1605(a)(2) застосовується коли позов: (1) "ґрунтується ... на діях, що здійснюються за межами території США"; (2) розглянутий "у зв'язку з комерційною діяльністю" НБУ за межами США; та (3) який "спричиняє[ив] прямий ефект у США". 28 U.S.C. § 1605(a)(2). Згідно 28 U.S.C. § 1605(a)(2), Відповідач виконував дії у США у зв'язку з комерційною діяльністю іноземної держави в інших місцях. Також згідно 28 U.S.C. § 1605(a)(2), Відповідач здійснював дії за межами території США у зв'язку з комерційною діяльністю, і зазначені дії спричинили прямий ефект у США.

b.     Комерційна діяльність, що є винятком з правил про імунітет згідно 28 U.S.C. § 1605(a)(5) передбачає, що іноземна держава не може мати імунітет від юрисдикції судів США або Штатів у будь-якій справі, в якій вимагається грошове відшкодування з іноземної держави за тілесні ушкодження або смерть, або пошкодження або втрату майна, що сталися в США і спричинені деліктною дією або бездіяльністю цієї іноземної держави або будь-якої посадової особи чи працівника цієї іноземної держави під час дії в межах його посадових або службових обов'язків. 28 U.S.C. § 1605(a)(5).

10.     FSIA визначає "комерційну діяльність" як "регулярне здійснення комерційної діяльності або конкретну комерційну операцію або дію. Комерційний характер діяльності визначається виходячи з характеру здійснюваної діяльності чи конкретної операції чи дії, а не з урахуванням її мети". 28 U.S.C. § 1603(d). Згідно 28 U.S.C. § 1603(e), а "'комерційна діяльність, що здійснюється в США іноземною державою" означає комерційну діяльність, що здійснюється такою державою та має значний контакт із США. НБУ неодноразово займався комерційною діяльністю в США, включаючи без обмежень наступне:

(i)     Агенти та представники Відповідача декілька разів літали до США для отримання інвестицій в державні облігації України, які продавалися американським громадянам та компаніям, у тому числі Взаємні фонди у США.

(ii)    Відповідач через своїх посадових осіб, які діяли згідно своїх посадових обов'язків, організував, спричинив, дозволив і погодився з відмиванням грошей, здійсненим Курченком разом із Майамською Групою (що обговорюється нижче) та компаніями і фізичними особами, що знаходяться у Флориді, від імені НБУ, його посадових осіб та Злочинного підприємства.

(iii)   НБУ вивів Кошти Позивача та використав їх для погашення відсотків за державні облігації України в США, що є прикладом суто комерційної діяльності, яка заважає Відповідачу заявляти суверенний імунітет згідно FSIA.

11.     Юрисдикція також є відповідною оскільки позов ґрунтується на комерційній діяльності, а саме: він виникає на підставі понад 102 млн. доларів США основної вартості депозитів та вкладень коштів у БрокБанк, які були комерційними операціями.[3] Після цього група Курченка, з відома та дозволу посадових осіб НБУ, які діяли згідно своїх посадових

_____

[3] Обговорюється нижче в розділі II.

6

обов'язків, вивела Кошти Позивача у БрокБанку та успішно відмила і вивела кошти через комерційні операції за участю компаній та фізичних осіб, що знаходиться в м.Майамі, штат Флорида. Згодом НБУ використовував Кошти Позивача для сплати відсотків за державними облігаціями в США, що також було комерційними операціями.

12.  Згідно § 28 U.S.C. § 1605(a)(5), Відповідач та його посадові особи вчинили деліктні дії та/або бездіяльність у США, які спричинили шкоду або втрату майна, що сталися в США та спричинені деліктною дією або бездіяльністю цієї іноземної держави або будь-якої посадової особи чи працівника цієї іноземної держави під час дії в межах його службових чи посадових обов'язків.

13.  Місцем розгляду справи є Окружний суд Сполучених Штатів Америки Південного округу штату Флорида згідно 28 U.S.C. § 1391 (f) (1) та (b) (2), (3), у зв'язку з тим, що значна та суттєва частина подій або бездіяльності, що спричинили цей Позов, відбулися в межах цього округу. Зокрема, у зв'язку з незаконними діями та бездіяльністю, НБУ та його посадові особи, діючи спільно із Злочинним підприємством, брали участь у складних схемах відмивання грошей, згідно яких сотні мільйонів доларів переказувались в Україні та США.

14.  Як обговорюється нижче, ці незаконні схеми включали, серед іншого, неправомірні дії Ігоря Коломойського (далі "Коломойський") та його компаній, у тому числі Optima Industrial Management, LLC, Optima International, Optima Ventures, LLC (разом "Група компаній Оптіма"), усі з яких здійснювали діяльність за адресою: 200 Саус Біскейн Бульвар, Офіс 5500, м.Майамі, штат Флорида,[4] та ПриватБанк, разом з іншим олігархом

---

[4] За збігом обставин офіси Групи компаній Оптіма розташовані в тому ж будинку в центрі Майамі, що і офіси адвокатів Позивача (Південно-Східний фінансовий центр).

Геннадієм Боголюбовим (далі "Боголюбов"), а також Мордехаєм Корфом, також відомий як "Мотті" (далі "Корф"), і Уріел Лейбер (далі "Лейбер"), що здійснюють діяльність у тих же самих офісах в м.Майамі (разом "Майамська Група"[5]), усі від імені та під керівництвом НБУ та його посадових осіб.

15.    Хоча Курченко та його компанії незаконно виводили кошти з БрокБанку від імені НБУ та його посадових осіб та інших, Курченко співпрацював з Майамською Групою, щоб відмити кошти, виведені з БрокБанку, через ПриватБанк та цілу низку компаній, та фізичних осіб, які знаходились в м.Майамі, штат Флорида, щоб повністю замаскувати їх характер, джерело, власність, та контроль. Потім НБУ використовував кошти, серед іншого, для погашення відсотків за українськими державними облігаціями. За інформацією та переконаннями, ці платежі були здійснені, серед іншого, інвестиційним фірмам, розташованим у Флориді, що обговорюється нижче.

## III.    ЗАГАЛЬНІ ЗВИНУВАЧЕННЯ

### I.    Умови для інвестицій та суперечок

16.    Ця суперечка базується на депозитах, внесених Інвесторами в український банк, відомий як БрокБанк.

17.    Зокрема, з 2012 до 2013 року Інвестори внесли кошти (далі "Кошти") в БрокБанк еквівалентні сумі 102,207,909.46 доларів США. Згідно депозитних договорів, БрокБанк тримав би Кошти Позивача і в обмін на них виплачував би відсотки Інвесторам (наприклад, подібно до того, як будь-який звичайний банк виплачував би відсотки, якщо б ви вносили кошти на ощадний рахунок або депозитний сертифікат).

---

[5] Обговорюється в розділі IV.(B) нижче.

18.     На жаль, з часом Кошти Позивача були виведені Злочинним підприємством та НБУ за сприяння посадових осіб НБУ, які діяли згідно своїх посадових обов'язків. Потім ці кошти відмивались через мережу шахрайських компаній, у тому числі через юридичних та фізичних осіб, що знаходились в м.Майамі, штат Флорида, і використовувались для придбання нерухомості по всій території США. Решта Коштів була вилучена Україною та використана НБУ для власної вигоди - а саме для погашення виплат процентних платежів за державними облігаціями американським інвестиційним компаніям, у тому числі Взаємні фонди у США (що придбала ці облігації для американських Інвесторів). Зв'язки НБУ та його посадових осіб, а також юридичних та фізичних осіб, які брали участь у скоординованій схемі рейдерських операцій БрокБанку, та їх взаємозв'язок детально викладено нижче.

19.     У квітні 2017 року в пресі з'явилася інформація, що Краматорський міський суд Донецької області в Україні постановив конфіскувати кошти з рахунків в Ощадбанку, до державного бюджету уряду України на суму приблизно 2,25 млрд. доларів США, що було ухвалено у січні 2015 року. 28 квітня 2017 року Генеральний прокурор України повідомив, що Ощадбанк завершив процедуру перерахування вилучених коштів до Державного казначейства. У той час президент України Порошенко заявив, що ці кошти будуть використані Україною для передусім зміцнення армії.

20.     Сума у понад 172 мільйони доларів США була перерахована в НБУ, що включала Кошти Позивача, які НБУ нібито використовував для сплати відсотків за державними борговими зобов'язаннями, у тому числі американським інвестиційним компаніям у Флориді. Однак серед вилучених державою Україна коштів були й кошти, виведені Злочинним підприємством, у тому числі Кошти Позивача. Замість повернення

9

коштів Позивачу, НБУ використав кошти на власну користь, і внаслідок цього несе відповідальність за збитки.

## IV. ЗЛОЧИННЕ ПІДПРИЄМСТВО – ПРЕДСТАВЛЕННЯ КОЖНОЇ ДІЮЧОЇ ОСОБИ

### 1. Перша Діюча особа: БрокБанк

21.     До банкрутства БрокБанк був відомою та шанованою фінансовою установою в Україні. Його походження можна простежити на самому початку України.  БрокБанк був зареєстрований як банк Національним банком України у жовтні 1991 р., і він виріс, щоб стати одним з найбільших банків України, доки з нього НБУ та Злочинне підприємство незаконно не вивели депозити, у тому числі Кошти Позивача, що є предметом суперечки.

22.     Станом на 2014 рік, БрокБанк був 16-м найбільшим банком в Україні за активами. За даними центрального банку БрокБанк мав активів на суму понад 3,47 мільярда доларів США[6] на початку 2014 року.

23.     У 2007 році контрольні акціонери БрокБанку включали двох заможних братів-українців: Сергія Буряка та Олександра Буряка (разом "Брати Буряки"). Обидва були відомими українськими бізнесменами, а також були членами українського парламенту.

24.     На початку 2013 року брати Буряки вирішили продати свою контрольну частку в БрокБанку.

25.     Продаж акціонерного капіталу братів Буряків у БрокБанку вимагав офіційного схвалення та згоди НБУ. Згідно українського законодавства, продаж 10% і більше цінних паперів, що зберігалися в БрокБанку, вимагав чіткого дозволу НБУ. Тим не менше, колишній голова НБУ Сергій Арбузов (далі "Арбузов") уклав посередницьку угоду

---

[6]Розраховано за курсом 0,12 грн. за 1 долар США, станом на 1 січня 2014 року.

про продаж БрокБанку групі компаній, контрольованих 28-річним українським олігархом і бізнесменом Сергієм Курченко[7] (далі "Курченко").

26.     Курченко, про якого детальніше йдеться нижче, потрапив під санкції у багатьох країнах світу (у тому числі у США, Великобританії та ЄС) та заочно обвинувачений та заарештований в Україні за відмивання грошей, серед інших незаконних дій.[8] Курченко потрапив під санкції США[9] та Європейського Союзу[10], разом з іншими високопосадовцями в уряді України, а саме Артемом Пшонкою, сином екс-генерального прокурора України Віктора Пшонки, та Олександром Януковичем, старшим сином екс-президента Віктора Януковича (далі "Янукович"). На початку 2019 року Януковича, який залишається в Росії, заочно засудили за звинуваченням в державній зраді до 13 років ув'язнення.

27.     Отримання контролю над БрокБанку було неправильним з самого початку. Приблизно 18 липня 2013 року компанія під назвою "СЄПЕК", яка належала Курченку, оголосила, що придбала 80% акцій в БрокБанку. Щоб уникнути отримання чіткого дозволу

---

[7] Обговорюється в розділі II.(D) нижче.

[8] В Україні пред'явлено звинувачення у кримінальній справі №758 / 15964/17 проти колишнього заступника директора департаменту інвестиційної діяльності Брокбізнесбанку, Винограда Юрія (далі "Виноград"). Виноград визнав себе винним у причетності до злочинної організації, очолюваної Курченком, як зазначено у вироку суду від 9 січня 2018 року. Важливо, що український карний суд також встановив, що в березні 2010 року Курченко організував та очолив злочинну організацію, через яку Курченко створив та/або придбав понад 400 компаній для здійснення фіктивної діяльності.

[9] 6 березня 2014 року Сполучені Штати запровадили основні санкції згідно з Президентським указом (далі "ПУ") 13660, який накладав санкції проти фізичних та юридичних осіб, відповідальних за порушення суверенітету та територіальної цілісності України або за крадіжку активів українського народу. У липні 2015 року США ввели санкції проти Курченка згідно з ПУ 13660.

[10] 5 березня 2014 року Рада Європейського Союзу також запровадила серйозні санкції, заморозивши рахунки колишнього президента України Віктора Януковича, його синів та 15 інших людей з його найближчого оточення, включаючи Курченка, та колишнього першого віце-прем'єр-міністра (і колишнього Голови НБУ), Арбузова та ін.

НБУ, Курченко створив вісім (8) фіктивних компаній (разом "Фіктивні компанії Курченко"), кожна з яких придбала 9,9836% частки в БрокБанку. Усі компанії були зареєстровані протягом тижневого періоду, і кожна придбала однаковий відсоток акцій (лише менше 10-відсоткового порогу) в БрокБанку, щоб уникнути порушення українського законодавства. Крім того, компанія Курченка, СЄПЕК, придбала 0,1585% частки в Банку.

28.     Курченко контролював СЄПЕК та Фіктивні компанії Курченко, і завдяки створеній схемі поступового придбання часток зміг придбати понад 80% (вісімдесят відсотків) частки в БрокБанку з явними відхиленнями та порушенням законодавства України.

29.     Посадовці НБУ сприяли, дозволили та брали участь у неналежному отриманні контролю Курченком над БрокБанком, що безпосередньо передувало незаконному вилученню коштів з Банку. Шахрайська схема Курченка щодо придбання БрокБанку через вісім (8) Фіктивних компаній Курченко  була схвалена посадовими особами НБУ, включаючи Арбузова, та його наступника Ігоря Соркіна (далі "Соркін").[11]

30.     Шахрайська схема Курченка щодо отримання контролю над БрокБанком (без виконання вимог, і/або уникнення виконання відповідних вимог законодавства України та отримання дозволів) була розкрита та підтверджена Антимонопольним комітетом України у справі № 656-р. Рішенням від 20 листопада 2018 року Антимонопольний комітет України встановив, серед іншого, що Фіктивні компанії Курченко мають спільні інтереси та

---

[11] Соркіна було затверджено новим головою НБУ в парламенті України 11 січня 2013 року, після того, як його призначив його близький соратник Арбузов, коли Арбузов був призначений першим віце-прем'єр-міністром України. Раніше Соркін займав посаду заступника Голови НБУ, відповідального за банківський нагляд. Соркін обіймав посаду голови НБУ з 11 січня 2013 року до 24 лютого 2014 року.

пов'язані з Курченком, і тому наклав штраф у розмірі 15,000,000.00 гривень (544,050.00 доларів США)[12] стосовно Курченка. Хоча Курченко оскаржив це рішення, 27 листопада 2019 року Господарський суд міста Києва прийняв та затвердив рішення Антимонопольного комітету України № 656-р від 20 листопада 2018 року.

**2. Друга Діюча особа – Арбузов (посадова особа НБУ) призначається в НБУ, потім стає віце-прем'єр-міністром України, звільняється з посади, тікає в Росію і потрапив під санкції Управління з контролю за іноземними активами США (OFAC)**

31.     Посадові особи НБУ підтримували дії та здійснювали діяльність (і діяльність) таким чином, що дозволили Злочинному підприємству незаконно відмити та вивести Кошти Позивача з БрокБанку, у тому числі Майамською групою, яка керувала компаніями Групи компаній Оптіма зі штаб-квартирою в м.Майамі, штат Флорида. Арбузов був однією із задіяних посадових осіб НБУ.

32.     У вересні 2010 року Арбузова було призначено заступником Голови НБУ. Лише через три місяці, 21 грудня 2010 р. Президент України направив до парламенту петицію про призначення Арбузова Головою НБУ. 23 грудня 2010 року парламент України схвалив петицію, зробивши Арбузова наймолодшим головою державного центрального банку. Потім, через два роки, 24 грудня 2012 року, тодішній президент України Віктор Янукович своїм указом президента призначив Арбузова першим віце-прем'єр-міністром України. Коли Арбузов перейшов на свою нову посаду, він доклав зусиль, щоб його найближчий союзник Соркін став новим головою НБУ.

33.     Згодом Арбузов втік з України. 3 січня 2020 року Арбузов був заочно заарештований Вищим антикорупційним судом в Україні відповідно до вимог частини 6

---

[12] Розраховано за курсом 0,03627 грн. за 1 долар США, станом на 20 листопада 2018 року.

статті 193 Кримінально-процесуального кодексу України за звинуваченням у привласненні та розтраті майна або заволодінні ним шляхом зловживаннями посадовими повноваженнями, що призвело до розтрати активів Національного банку на суму 220 млн. грн. (понад 7,7 млн. доларів США). 12 січня 2015 року Янукович став міжнародним втікачем, коли ІНТЕРПОЛ видав проти нього червоний бюлетень за звинуваченнями, у тому числі стосовно привласнення та розтрати майна.

34.     Протягом усього часу, коли вони обіймали свої офіційні посади в НБУ та на інших державних посадах в уряді України, Арбузов та Соркін сприяли своїми діями (і бездіяльністю), що дозволило б вилучати Кошти Позивача з БрокБанку Злочинним підприємством, включаючи Майамську Групу, що діяла з м.Майамі, штат Флорида. Арбузов і Соркін мали підтримку тодішнього президента України Януковича.

35.     Посадові особи НБУ, діючи згідно службових обов'язків, були співучасниками та брали участь у схемі, за якою Курченко виводив кошти з БрокБанку. Посадові особи НБУ, діючи згідно службових обов'язків, дозволили проведення бекдор-транзакцій та інших незаконних схем переказу коштів з БрокБанку, за яких НБУ та його працівники навмисно діяли (або утримувались від дій) спільно за шахрайською схемою виведення активів Банку. Крім того, НБУ був співучасником шахрайства внаслідок нездійснення нагляду та регулювання діяльності БрокБанку.

### 3.   Третя Діюча особа – Президент України Янукович розтратив кошти; його було усунуто з посади, втік до Росії та потрапив під санкції Управління з контролю за іноземними активами США (OFAC)

36.     Однак картковий будинок розвалився, коли Януковича було усунуто з посади та звинуватили у порушеннях прав людини в Україні та розтраті коштів. 22 лютого 2014 року 328 із 447 народних депутатів України - або близько 73% народних депутатів -

14

проголосували за "усунення Віктора Януковича з посади президента України" на тій підставі, що він не зміг виконати свою обов'язки.

37.     28 січня 2014 року, після масштабних протестів в Україні, український прем'єр-міністр Микола Азаров (далі "Азаров") подав у відставку і втік до Росії. В результаті Арбузов (який був віце-прем'єр-міністром) на той день став прем'єр-міністром України. Арбузов обіймав посаду прем'єр-міністра України менше місяця, коли незабаром після цього Арбузов втік з країни. Арбузов став утікачем, коли Генеральний прокурор України направив запит в ІНТЕРПОЛ внести його у список розшукуваних осіб. У даний, як вважають, Арбузов переховується в Росії.

38.     В результаті 11 вересня 2015 року Генеральна прокуратура України звернулася з проханням про арешт коштів, які, як вважають, були пов'язані з Арбузовим, як частина плану НБУ та його посадових осіб щодо відмивання та виведення Коштів Позивача. Як результат, за повідомленнями Латвійського суду у компаній, пов'язаних з Арбузовим, було вилучено 49,3 млн. доларів США.

39.     У квітні 2014 року виконуючий обов'язки генерального прокурора Олег Махніцький повідомив, що, будучи президентом з 2010 року, Янукович особисто керував багатомільярдним злочинним синдикатом, щупальці якого охопили майже всі сфери української держави та українського життя. "Екс-президент Віктор Янукович очолював мафіозну структуру в Україні, яка розповсюдилася по різних державних структурах", - повідомляє Махніцький повідомив у Лондоні міжнародній інвестиційній спільності після зустрічей з американськими та британськими посадовими особами про способи повернення викрадених активів.

40.     У квітні 2014 року Генеральний прокурор США Ерік Холдер публічно заявив, що Сполучені Штати твердо вирішили допомогти Україні знайти мільярди доларів, які, як вона стверджує, були вкрадені Януковичем та його помічниками. "Ми твердо вирішили притягнути до відповідальності тих, хто відповідав за крадіжку цих українських активів. . . Помилки не повинно бути, ми рішучі в своїх зусиллях досягти успіху, ми повні рішуче притягнути до відповідальності тих, хто був винним у розкраданні цих українських активів, і ми також налаштовані забезпечити повернення цих активів українському народу."

41.     11 березня 2015 року Управління з контролю за іноземними активами США (OFAC) при Міністерстві фінансів США наклало санкції на Арбузова згідно Президентського Указу 13660 (ПУ 13660), що уповноважувало США накладати санкції на певних осіб, якщо буде встановлено, що вони брали участь у певних діях або політиці, що сприяють дестабілізації ситуації в Україні. Це було здійснено додатково до санкцій, накладених на Арбузова Європейським Союзом 5 березня 2014 року, про що йшлося раніше.

### 4.  Четверта Діюча особа – Соркін (посадова особа НБУ) замінює Арбузова на посаді Голови НБУ, але зараз розшукується Генеральною прокуратурою України за розкрадання коштів

42.     Соркіна, якого було призначено заступником на посаду Арбузова в НБУ, об'явлений Україною у всеукраїнській розшук за підозрою у вчиненні правопорушення, встановленого статтею 191 п. 5 стаття 255 п. 1 Кримінального кодексу України. Зокрема, Генеральна прокуратура України розслідувала кримінальне провадження № 42015000000001955, яке було порушено 18 вересня 2015 року щодо підозри Соркіна як колишнього Голови НБУ. 7 вересня 2015 року Генеральна прокуратура України опублікувала повідомлення про підозру щодо Соркіна у вчиненні злочинів, передбачених ч. 1 ст. 255 (створення злочинної організації) та ч. 5 ст. 191 (привласнення, розтрата чи

заволодіння майном шляхом зловживання службовим становищем) Кримінального кодексу. Це еквівалент обвинувального висновку згідно із законодавством США.

43.     1 березня 2016 року було видано ордер на арешт Соркіна. Станом на 13 червня 2018 року він був у всеукраїнському розшуку за підозрою у скоєнні злочину. Однак він втік з України станом на 20 вересня 2014 року.

**5. П'ята Діюча особа – Гонтарева (посадова особа НБУ) стає головою НБУ; зараз є учасником кримінальної справи стосовно БрокБанку та допомоги у злочинній організації**

44.     У складі Злочинного підприємництва, Валерія Гонтарева (далі "Гонтарева") брала участь у відмиванні грошей з БрокБанку, і будучи Головою НБУ, вона навмисно не вживала жодних дій щодо повернення привласнених Коштів до БрокБанку, а також для повернення Коштів Позивача Інвесторам або Позивачу.

45.     У 2014 році, після інавгурації нового президента України Петра Порошенка [13] (далі "Порошенко"), було сформовано новий склад Кабінету Міністрів України та призначено нове керівництво НБУ (Правління та Наглядова рада).

46.     19 червня 2014 року Валерію Гонтареву (далі "Гонтарева") було призначено Головою НБУ.

47.     Раніше Гонтарева працювала Головою Інвестиційний Капітал Україна (далі "ІКУ"), групи фінансових компаній, що знаходилась в Києві, з 2007 по 2014 рік. Як повідомлялося, вона продала свій пакет акцій у компанії (усі акції та частки) перш ніж стати головою НБУ. Однак були суперечливі дискусії щодо незалежності її політики через її тісні стосунки з президентом Порошенком.

---

[13] Порошенко - відомий український олігарх, бізнесмен і політик, який обіймав посаду п'ятого президента України з 7 червня 2014 року до 20 травня 2019 року.

48.     Зокрема, під час роботи Гонтаревої в якості Голови ІКУ, ІКУ була посередницькою компанією, яка отримувала гроші, що включали перекази в БрокБанк та з нього, і, зокрема, суб'єктом господарювання, що перебував у державній власності України, відомим як ПАТ "Аграрний фонд" (далі "Аграрний фонд").

49.     28 березня 2019 року Генеральна прокуратура України розпочала розслідування щодо Гонтаревої щодо її участі у злочинній організації та сприяння незаконному заволодінню чужим майном - грошовими коштами Аграрного фонду на суму 2,069 млрд. грн. шляхом укладання фіктивних "договорів купівлі-продажу" облігацій внутрішньої державної позики з Аграрним фондом за договорами прямого викупу з НБУ.

50.     За даними слідства проти Гонтаревої, протягом листопада-грудня 2013 року офшорні компанії за допомогою компанії ІКУ, яку очолювала Гонтарева, та з відома, за згодою та участю НБУ та його посадових осіб, перерахували кошти БрокБанку на рахунки Ощадбанку України та придбали валютні облігації.

51.     28 березня 2019 року було повідомлено, що Генеральна прокуратура України підозрює оточення Порошенка у сприянні злочинам втікача-олігарха Курченка у "справі Курченко", яка об'єднує численні тяжкі злочини, скоєні за попередні 10 років. Йдеться про розкрадання мільярдів доларів та легалізацію цих незаконних доходів. Слідство Генеральної прокуратури назвало Відповідачів у справі членами "злочинної організації Віктора Януковича" і відзначило одну з ключових ролей Курченка. Гонтарева також підозрюється у співучасті. Порошенко з'явився в суді в Україні 18 червня 2020 року для досудового слухання за звинуваченнями, пов'язаними із зловживанням службовим становищем під час його президентства. Це один із близько двадцяти випадків в Україні за участю Порошенка.

52.    Таким чином, навіть після зміни влади в Україні під керівництвом Януковича, Арбузова та Соркіна, новий уряд в Україні (Порошенко-Гонтарева) продовжував приховувати незаконні дії Злочинного підприємства та НБУ, і тому не був зацікавлений у поверненні коштів БрокБанку, щоб він міг відновити нормальну діяльність через їхню участь під час виведення коштів (і прийнятті рішення про збереження коштів на користь НБУ та на шкоду вкладникам БрокБанку).

53.    Колишня голова НБУ Гонтарева також брала участь у розслідуваннях, пов'язаних з грошима Януковича (заочно засуджений) та злочинах Курченка (заочно затриманий), пов'язаних з відмиванням грошей, активи яких заморожені Україною. У рішенні Краматорського суду, який конфіскував так звані 2,25 млрд. доларів США Януковича, обговорюється фінансова компанія ІКУ, якою керувала Гонтарева.

54.    ІКУ була однією з компаній, залучених до схеми Курченка за участю американських та офшорних компаній, купуючи валютні облігації державної позики, легалізуючи таким чином виведені гроші. Фактично, ІКУ Гонтаревої допомогла вивести та відмити вкрадені 2,25 млрд. доларів США, що включали Кошти Позивача, виведені з БрокБанку.

55.    Таким чином, Гонтарева, виконуючи обов'язки голови НБУ, та будучи посадовцем уряду України, навмисно не виявляла жодних ініціатив щодо повернення незаконно привласнених Коштів назад до БрокБанку, або повернути їх до Інвесторів та інших кредиторів БрокБанку, у яких були викрадені конфісковані гроші.

**6.   Шоста Діюча особа – Національний банк України**

56.    НБУ - це українська державна установа та/або агентство, якому доручається регулювати банківський сектор, контролювати діяльність комерційних банків та реагувати на (та запобігати) порушенням у банківському секторі.

57.    Діяльність НБУ суворо контролюються згідно Закону України "Про Національний банк України". Згідно Розділу X. Банківське регулювання та банківський нагляд, Стаття 55, основною метою законів про банківське регулювання та нагляд, що встановлюють обов'язки та зобов'язання НБУ, є забезпечення безпеки та фінансової стабільності банківської системи України, а також захист інтереси вкладників та кредиторів НБУ та інших українських банків.

58.    Згідно Розділу IV, Глава 12, Стаття 67, та Глава 14, Стаття 71 Закону України "Про банки та банківську діяльність", НБУ зобов'язаний забезпечувати стабільність банківської системи та захищати інтереси вкладників та кредиторів банку щодо безпеки коштів клієнтів на банківських рахунках, у тому числі у БрокБанку. НБУ юридично зобов'язаний здійснювати нагляд за банківською діяльністю всіх комерційних банків, що працюють в Україні, серед іншого, проводячи щорічні аудити та контроль на місцях.

59.    Міністерство фінансів України спільно з Національним банком України також пропонує державні облігації на продаж у всьому світі, у тому числі в США. Наприклад, у 2013 році український уряд лобіював Franklin Templeton, направивши Арбузова, першого віце-прем'єр-міністра України[14] на той час колишнього Голову Національного банку України [15] до США, щоб спробувати переконати Franklin Templeton, світову інвестиційну компанію з офісами у Флориді, придбати державні облігації.

---

[14] Арбузов виконував ці обов'язки з 24 грудня 2012 року до 28 січня 2014 року.
[15] Арбузов виконував ці обов'язки з 23 грудня 2010 року до 24 грудня 2012 року.

60.     Як результат, до 2014 року Franklin Templeton, що здійснювала діяльність в США, була одним із найбільших покупців міжнародного боргу України. Повідомлялося, що станом на серпень 2014 року Franklin Templeton володів українськими державними зобов'язаннями номінальною вартістю майже 5 мільярдів доларів США, що, як повідомлялося, становило *майже п'яту частину непогашених міжнародних державних облігацій України* в 2014 році.

61.     За будь-яких обставин суттєвим у цій справі є те, що НБУ, як українська державна установа та/або агентство, не тільки не виконував свої обов'язки щодо регулювання банків, у тому числі БрокБанк, та запобігання порушенням, але навпаки він діяв та навмисно утримувався від дій, а посадові особи НБУ активно брали участь у навмисному виведенні коштів з БрокБанку.

62.     Після того, як Україна арештувала кошти, отримані в результаті незаконної операції з відмивання грошей, включаючи операції в США у зв'язку з виведенням коштів з БрокБанку, НБУ повинен був повернути неправомірно виведені кошти вкладникам БрокБанку.

63.     Натомість, 4 березня 2014 року НБУ примусив БрокБанк об'явити себе неплатоспроможним, а його банківська ліцензія була анульована 10 червня 2014 року. Інвестори та інші вкладники Банку змушені були вважати, що їх кошти будуть повернуті після завершення ліквідаційного провадження.

64.     Однак ліквідація Банку була здійснена 15 жовтня 2019 року, а НБУ не вдалося повернути усі неправомірно вилучені кошти, у тому числі Кошти Позивача. Замість того, щоб повертати активи вкладникам БрокБанку, НБУ тоді використовував ці кошти (які були надходженнями від схеми відмивання грошей, що діяла в м.Майамі, штат Флорида) на

власну користь. Наприклад, серед іншого, НБУ використовував ці кошти для погашення відсотків за українськими державними облігаціями в США, включаючи виплати американським інвестиційним компаніям у Флориді.

65. НБУ та його посадові особи (багато з яких на той час були під санкціями за неправомірні дії, включаючи розкрадання, крадіжки та шахрайство) були співучасниками і брали участь у схемі, за якою Курченко ініціював процес виведення коштів з БрокБанку.[16] Посадові особи НБУ мали виграти від виведення коштів з БрокБанку, за якого посадові особи НБУ діяли (або утримувались від дії) за шахрайською схемою виведення активів Банку. НБУ потім використовував ці арештовані відмиті кошти для власних цілей, включаючи погашення відсотків за державними облігаціями уряду України, власникам облігацій у тому числі тим, що знаходяться у США, замість того, щоб виплатити кошти Інвесторам та іншим вкладникам БрокБанку.

66. Після того, як Україна арештувала відмиті кошти Злочинного підприємства і після того, як БрокБанк був доведений до банкрутства, замість того, щоб повернути арештовані кошти вкладникам БрокБанку, у тому числі Цедентам Позивача, НБУ потім використовував ці виведені кошти для власних цілей, включаючи погашення відсотків за державними облігаціями (у тому числі в США та у Флориді).

67. Після того, як Курченко неналежним чином отримав контроль над БрокБанком, він приступив до дій за згодою та обізнаністю про це НБУ та його посадових осіб, включаючи Арбузова та Соркіна, з метою виведення активів Банку, у тому числі

---

[16] Наприклад, кошти були виведені з Брокбізнесбанку, використані для оплати різних фіктивних витрат (наприклад, на транспортування, переробку та зберігання нафти), передані через компанії "Групи компаній Оптіма" іншим суб'єктам господарювання та банкам, включаючи ПриватБанк, і передані до Злочинного підприємства, а також посадовим особам НБУ на їх власну користь.

Коштів Позивача, через мережу шахрайських компаній, відмиваючи гроші через юридичні особи та трансакції у Флориді разом з Коломойським, Корфом та Лейбером, що діяли в м.Майамі, штат Флорида. Крім того, Група Курченко виводила кошти з Банку та координувала свої дії з Майамською Групою для незаконного відмивання та переказу Коштів Позивача з БрокБанку через низку компаній, включаючи ті, що знаходяться в м.Майамі, штат Флорида, та через придбання нерухомості по всій території США. Це було сплановано та здійснено НБУ, його посадовцями, та Злочинним підприємством, щоб замаскувати характер, джерело, право власності та контроль над виведеними коштами, у тому числі Коштами Позивача.

7. **Сьома Діюча особа: Сергій Курченко та Реал Банк (Восьма Діюча особа)**

68.     Також у складі Злочинного підприємства, Курченко передавав відмиті кошти, у тому числі Кошти Позивача, за згодою, з відома та за співучастю посадових осіб НБУ, привласнив та вивів Кошти Позивача у Флориді з Майамською Групою. Курченко - це 35-річний український олігарх та бізнесмен, засновник/власник групи газових компаній в Україні, що спеціалізується на торгівлі скрапленим природним газом. Курченко також є колишнім власником і президентом футбольної команди ФК "Металіст" Харків та групи "Український медіа холдинг".

69.     Як повідомлялось, Курченко був тісно пов'язаний з Януковичем, якого усунули від влади через його спроби приєднати Україну до Росії, а не до Європейського Союзу. Як обговорювалося вище, колишній президент Янукович сам звинувачується нинішнім українським урядом у крадіжці мільярдів доларів у держави.

70.     Зіткнувшись із кримінальним обвинуваченнями та розпадом його Злочинного підприємства, Курченко втік з України в лютому 2014 року, і зараз він перебуває в Росії. У

березні 2014 року Україна оголосила Курченка в міжнародний розшук із залученням ІНТЕРПОЛу.

71.    24 березня 2014 року Генеральна прокуратура України оголосила розслідування щодо "створення злочинної організації" Курченко, якого вона назвала "близьким до "сім'ї" екс-президента України Віктора Януковича". Його майно та інші активи вилучено урядом України, включаючи його частку в ФК "Металіст" та інші активи.

72.    Через два роки, 28 березня 2016 року Генеральний прокурор України повідомив, що Департамент міжнародно-правового співробітництва Генеральної прокуратури завершив розслідування кримінального провадження проти Курченка, якого підозрюють у створенні злочинної організації, яка вчинила злочини з січня 2010 року по лютий 2014 року. Курченку інкримінується низка злочинних дій, що загалом становлять 637 млн. доларів США, у тому числі:

  a. придбання скрапленого газу в "Укрнафти" та "Укргазвидобування" на суму 2,196 млрд. грн. (77.3 млн. доларів США)[17];

  b. виведення коштів НАК "Нафтогаз України" на суму 450,0 млн. грн. (15.8 млн. доларів США);

  c. виведення коштів НАК "Нафтогаз України" на суму 5,100 млрд. грн. (179.6 млн. доларів США);

  d. виведення коштів НБУ на суму 787,4 млн. грн. (27.7 млн. доларів США), які були виділені у формі стабілізаційної позики Реал Банку;

---

[17] Розраховано за курсом 1 грн. за 0,03845 долар США, станом на 28 березня 2016 року.

e. виведення коштів Реал Банку на суму 4,707 млрд. грн. (165.8 млн. доларів США), які були видані у формі позик підприємствам, підконтрольним Курченку;

f. виведення коштів БрокБанку на суму 865,9 млн грн (30.5 млн. доларів США) шляхом видачі міжбанківських позик Реал Банку та розміщення їх на кореспондентському рахунку в Реал Банку;

g. виведення коштів БрокБанку на суму 1,437 млрд. грн. (50.6 млн. доларів США) шляхом видачі позик фіктивним підприємствам;

h. виведення коштів, що належать Укргазбанку, на суму 502,3 млн. грн. (17.7 млн. доларів США) шляхом укладання фіктивних договорів на продаж та купівлю облігацій Держіпотеки;

i. виведення коштів ПАТ "Аграрний фонд" на суму 2,069 млрд. грн. (72.9 млн. доларів США) шляхом укладання фіктивних договорів купівлі-продажу внутрішніх державних облігацій з Аграрним фондом та прямих угод РЕПО з НБУ.

73.     В ході розслідування кримінальної справи України проти Курченка було встановлено десятки інших осіб, які працювали в його Злочинному підприємстві. Кошти Позивача були серед коштів, виведених Курченко, з відому, за згодою, та за сприяння НБУ та його посадових осіб, та інших осіб. Наприклад, Печерський районний суд Києва також заочно заарештував екс-главу НБУ Соркіна. Він також був оголошений у міжнародний розшук Генеральною прокуратурою України, і було оголошено ордер на його арешт, щоб його могли затримати та допитати. Соркіна підозрюють у заволодінні коштами Аграрного фонду на суму понад 2,8 млрд. грн. шляхом змови з посадовими особами БрокБанку.

74. Протягом весни 2019 року у кримінальній справі Курченка Генеральна прокуратура України також оголосила, що екс-глава НБУ Соркін, можливо, був співучасником Курченка, поки Курченко мав контрольний пакет акцій БрокБанку.

75. 3 січня 2017 року слідчий суддя Печерського районного суду міста Києва ухвалив задовольнити повторний запит Генеральної прокуратури про обрання запобіжних заходів у вигляді тримання під вартою щодо Курченка. Генеральна прокуратура повідомила, що вони проводили розслідування щодо Курченка за підозрою у створенні та управлінні злочинною організацією та привласненні майна за допомогою державних та приватних банківських установ, державних підприємств паливно-енергетичного комплексу у великому розмірі. Як повідомлялося, Генеральна прокуратура України підозрює Курченка у скоєнні тяжких злочинів як керівника злочинної групи, починаючи з початку 2010 року, усі з яких привели до втрати або виведення Коштів Позивача.

76. Курченко також звинувачується українським урядом у систематичному ухиленні від сплати податків на мільйони доларів за змовою посадових осіб в адміністрації Януковича. Повідомляється, що Віталій Ярема, генеральний прокурор України, заявив, що Курченко перебуває під слідством за те, що він нібито не заплатив державі 130 млн. доларів податку та вивів понад 180 млн. доларів США, що належали Інвесторам банку.

77. СБУ описала Курченка як "головного фінансового директора" того, що в Україні стало відоме як "сім'я", термін для помічників Януковича, що брали участь в схемі розкрадання мільйонів власників депозитів з БрокБанку та ПриватБанку, у тому числі Коштів Позивача. Протягом 2014 року, Арсен Аваков, міністр внутрішніх справ України, заявив: " Курченко був просто менеджером" для сім'ї Януковича. "Його біографія була

чистою - просто тому, що він був молодим чоловіком - і саме тому вони поставили його як прикриття для сім'ї."

### 9. Коломойський (Дев'ята Діюча особа)

78.    В складі Злочинного підприємства, Курченко передавав відмиті кошти, у тому числі Кошти Позивача, своєму бізнес-партнеру Коломойському та його компаніям.

### 10. Боголюбов (Десята Діюча особа)

79.    Коломойський був одним із основних власників ще одного добре відомого українського банку, ПриватБанку. Коломойський разом із Боголюбовим здійснював контроль над ПриватБанком та його діяльністю.

### 11. Корф (Одинадцята Діюча особа)

80.    Корф - це діловий партнер Коломойського та Боголюбова в Майамі. Корф допомагав купувати та керувати бізнес-імперією українських олігархів у США, а також був частковим власником філії ПриватБанку.

### 12. Лейбер (Дванадцята Діюча особа)

81.    Лейбер співпрацював в Майамі з Корфом та Коломойським, а також був членом наглядової ради української нафтогазової компанії "Укрнафта", в якій група Приват мала значну частку.

### 13. Optima Industrial Management, LLC (Тринадцята Діюча особа), Optima International (Чотирнадцята Діюча особа), Optima Ventures, LLC (П'ятнадцята Діюча особа)

82.    Корф і Лейбер співпрацювали з Коломойським і працювали через штаб-квартиру в Майамі, Група компаній Оптіма, з метою придбання та управління юридичними особами, що знаходяться в США, а також інвестиціями в нерухомість по всій території США для організації відмивання грошей. Коломойський, Боголюбов, Корф і Лейбер разом

27

з іншими особами (у тому числі Курченко), а також за згодою, з відома за співучасті посадових осіб НБУ, привласнили і вивели Кошти Позивача у Флориді. Вони створили цю схему, використовуючи Групу компаній Оптіма, що знаходиться в м.Майамі. штат Флорида, і розробили схему виведення коштів з БрокБанку та ПриватБанку, у тому числі Коштів Позивача, депонованих у банки та довірених банкам, для себе шляхом фіктивних позик суб'єктам господарювання, якими володіло та які контролювало Злочинне підприємство.

83.    Курченко та Коломойський часто співпрацювали для цих переказів коштів та керували Злочинним підприємством зі штаб-квартири в м.Майамі, штат Флорида, беручи виведені кошти та інвестуючи їх у різні підприємства, як описано в цьому документі.

84.    У 2014 році, в той час, коли БрокБанк був ліквідований НБУ, банк Коломойського, "ПриватБанк" також відчував фінансові проблеми в основному внаслідок незаконних операцій з відмивання грошей, що здійснювались Злочинним підприємством.

85.    Як у випадку з БрокБанком, НБУ та його посадові особи також внутрішньо вирішили та погодились взяти під контроль ПриватБанк, і під час процесу націоналізації у 2016 році НБУ та його представники мали справу переважно з Коломойським та Боголюбовим, та обманним шляхом намагалися домовитись про угоду про повернення коштів Інвесторам ПриватБанку. Однак, замість повернення відмитих коштів Інвесторам, Курченко, Коломойський та Боголюбов розробили схему, щоб забрати кошти банку - гроші, довірені йому вкладниками, у тому числі Кошти Позивача — на власну користь.

86.    Після втечі з України Курченко продовжував активно співпрацювати з Коломойським та його компаніями для виведення коштів з БрокБанку та ПриватБанку, у тому числі Коштів Позивача. Зокрема, про це свідчить велика кількість телефонних розмов,

які були опубліковані в Інтернеті (та які Позивач розшифрував і переклав). У цих розмовах Коломойський та Курченко, серед іншого, обговорювали:

    a. Як вони керували ПриватБанком та БрокБанком;

    b. Як Курченко придбав контрольний пакет акцій БрокБанку, а згодом отримав стабілізаційний кредит (рефінансування) у НБУ;

    c. Курченко стверджував, що компанії Коломойського виводили кошти з ПриватБанку, і Коломойський схоже визнав це;

    d. Курченко стверджував, що Коломойський має приблизно 49 млн. доларів нафти, яка належить компаніям Курченка, і що Коломойський заборгував компаніям Курченко приблизно 20 млн. доларів США. Коломойський не доставив і відмовився доставити нафту або повернути кошти Курченку, що завадило Курченку повернути Кошти Позивача в БрокБанк; та

    e. Дискусія щодо того, як Курченко через свої компанії перерахував компаніям Коломойського приблизно 40 млн. доларів США як передоплату за придбання нафти, включаючи рахунки української нафтогазової компанії "Укрнафта"[18](українська компанія з видобутку нафти та природного газу) в ПриватБанку. 40 мільйонів доларів США включали Кошти Позивача, які були передані Курченком до

---

[18]До 2015 року "Укрнафтою" керували особи, підконтрольні Коломойському та Боголюбову. Повідомлялося, що "Група Приват" Коломойського змогла забезпечити контроль над компанією через відносини та платежі (опосередковано), пов'язані з тодішнім президентом Леонідом Кучмою. У 2015 році український парламент прийняв закон, який дозволив компанії провести збори акціонерів і витіснити Групу Приват Коломойського з оперативного менеджменту "Укрнафти".

Майамської групи, яка потім відмила ці 40 мільйонів доларів США через Групу компаній Оптіма в м.Майамі, штат Флорида.[19]

### 14. Укрнафта (Шістнадцята Діюча особа)

87.    На підставі вищезазначених розмов, а також на підставі інформації та переконань, Коломойський зміг скористатися Курченком та його статусом розшукуваної особи, щоб перевезти нафту з заводу Курченка, яку Курченко придбав із відмитих коштів (у тому числі Коштів Позивача), через "Укрнафту", яку Коломойський контролював, на користь Коломойського та НБУ та його посадових осіб. Коломойський продав нафту та використав виручені кошти (приблизно 40 млн. доларів США) для придбання нерухомості та інших активів у США.

### 15. ПриватБанк (Сімнадцята Діюча особа)

88.    Таким чином, кошти (у тому числі Кошти Позивача) відмиті та виведені Майамською Групою, включали не лише кошти ПриватБанку, а й кошти, виведені Групою Курченко, за співучасті та за згодою посадових осіб НБУ, з БрокБанку. Іншими словами, Коломойський використовував кошти, спочатку виведені Курченком (з БрокБанку), для придбання нерухомості та інших активів у США. Наразі ці активи є предметом двох проваджень про виведення активів, розпочатих Міністерством юстиції США в Південному окрузі Флориди.[20] Як було продемонстровано в цих судових позовах, значна частина подій відбулася в м.Майамі, штат Флорида, через Коломойського, Корфа та Лейбера та компанії

---

[19] Таким чином, Курченко передав гроші (для транспортування, обробки та зберігання нафти Укрнафтою), шляхом сплати грошей на рахунки у ПриватБанку – банку, контрольованому Майамською Групою.

[20] *Див.* Розділ II(B.) нижче.

"Групи компаній Оптіма", що дало підстави для цих двох паралельних федеральних проваджень.

## VI. Інвестиції

89.    Як зазначено в параграфі 6 вище, 14 вересня 2020 року Інвестори передали всі свої права на задоволення вимог про повернення Коштів Позивача (разом з усіма іншими правами на стягнення відсотків, пені, втраченої вигоди та усіх компенсаційних, статутних, штрафних та всіх інших збитків та вимог у зв'язку із Коштами) Позивачу, для належного та вартісного розгляду, більш конкретно викладеного в дорученнях. Див. Додаток "А." Інвестовані Кошти узагальнені таким чином:

### 1. Інвестиції Zukk

90.    Згідно Угоди про переуступку між Позивачем та Zukk від 14 вересня 2020 року Позивачу було надано перевагу права вимоги, що випливає з наступних договорів, укладених Zukk з БрокБанком:

a.   № 01-07-2010 від 07.07.2010 на суму 15,000,000.00 доларів США;

b.   № 02-07-2010 від 07.07.2010 на суму 15,000,000.00 доларів США;

c.   № 03-07-2010 від 07.07.2010 на суму 15,000,000.00 доларів США;

d.   № 04-07-2010 від 07.07.2010 на суму 15,000,000.00 доларів США; та

e.   № 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 від 29 жовтня 2012 року на суму 35,000,000.00 доларів США.

91.    Ці інвестиції на загальну суму 95,000,000.00 доларів США спільно називаються "Інвестиції Zukk". Достовірна та точна копію договорів, що лежать в основі Інвестицій Zukk, додається як **Додаток "С."**

31

### 2. *Інвестиції Інтертрансгруп*

92.     Згідно Угоди про переуступку між Позивачем та Інтертрансгруп від 14 вересня 2020 року, Позивачу було надано перевагу права вимоги, що випливає з наступних договорів, укладених Інтертрансгруп з БрокБанком:

    a.  Договір банківського вкладу № 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 від 27 грудня 2012 року. Це включає депозити на суму 1,500,000.00 доларів США, що підтверджено платіжними дорученнями: № 104 від 27 грудня 2012 року, № 6 від 25 січня 2013 року, № 12 від 14 лютого 2013 року, № 23 від 26 березня 2013 року та № 115 від 26 грудня 2013 року;

    b.  Договір банківського вкладу № 28-03-2013 від 03/04/2013 про розміщення коштів на суму 38,000,000.00 грн., сума підтверджена платіжним дорученням № 19 від 04 квітня 2013 року;

    c.  Договір № 22479 від 02.06.2011 на суму 586,880.65 грн.;

    d.  Договір № 105355 від 12 грудня 2012 року;

    e.  Договір № 105354 від 12 грудня 2012 року; та

    f.  Договір № КСКР / 20 від 12 серпня 2010 року.

93.     Ці інвестиції в доларовому еквіваленті на загальну суму в розмірі 2,892,705.46 доларів США спільно називаються "Інвестиції Інтертрансгруп". Достовірна та точна копію договорів, що лежать в основі Інвестицій Інтертрансгруп, додається як **Додаток "D."**

### 3. *Інвестиції Ковзеля*

94.     Згідно Угоди про переуступку між Позивачем та паном Ковзелем від 14 вересня 2020 року Позивачу було надано перевагу права вимоги, що випливає із наступного договору, укладеного паном Ковзелем з БрокБанком: Договір банківського вкладу № 323-

32

01-13-840 від 11 січня 2013 року на загальну суму 4,185,204.00 доларів США, коштів вкладених паном Ковзелем у БрокБанк (далі "Інвестиції Ковзеля"). Достовірна та точна копія депозитного договору, що лежить в основі Інвестицій Ковзеля, додається як **Додаток "E."**

### 4. *Інвестиції Дідилівського*

95.     Згідно Угоди про переуступку між Позивачем та паном Дідилівським від 14 вересня 2020 року пану Жуковському були надано перевагу права вимоги, що випливає із наступного договору, укладеного паном Дідилівським з БрокБанком: Договір банківського вкладу № D_150676669 від 23 грудня 2013 року на загальну суму 130,000.00 доларів США, коштів вкладених паном Дідилівським у БрокБанк під річний відсоток у розмірі 11,5% (далі "Інвестиції Дідилівського"). Достовірна та точна копія депозитного договору, що лежить в основі Інвестицій Дідилівського, додається як **Додаток "F."**

**VII.    Взаємозв'язок між діюча особами; дії спільно з посадовими особами НБУ для відмивання та виведення Коштів Позивача, а також стосунки та зв'язок між фізичними особами, компаніями та Флоридою**

96.     Як обговорювалося, Інвестори від початку внесли в БрокБанк понад 102 млн. доларів США (частина з яких пізніше була передана ПриватБанку). Але невідомо для них, незабаром після цього, Курченко разом із Злочинним підприємством з НБУ та його посадовими особами розробили план створення низки незаконних операцій та інвестицій, що дозволило їм перенаправляти та виводити Кошти Позивача з БрокБанку та ПриватБанку до Злочинного підприємства та посадових осіб НБУ. Все це було зроблено з відома, за згодою та за співучасті НБУ через його посадових осіб, які діяли згідно своїх службових обов'язків.

33

97.     БрокБанк та Реал Банк, ще один підконтрольний Курченком банк, залучали кошти у вигляді депозитів фізичних та юридичних осіб, які згодом були виведені за кордон шляхом надання "позик" фіктивним підприємствам без належного забезпечення (застави).

98.     Таким чином, Кошти Позивача були виведені з БрокБанку, через компанії Групи компаній Оптіма, ПриватБанк та інші організації, шляхом фіктивних "позик". Кошти надсилались через різні фірми як фінансова допомога, платежі чи інші перекази, щоб приховати їх справжнє джерело походження. Потім кошти, у тому числі Кошти Позивача, переказувались офшорним компаніям через підставні компанії, шляхом переказу коштів (наприклад, в обмін на "паливо", - що було пов'язане з компаніями Курченка, які беруть займаються паливом, - або не згадуючи жодного призначення платежу або посилання на транзакцію). Потім це "паливо" нібито незаконно ввозилось на територію України без митного оформлення, воно продавалось, а кошти переказувались назад до Злочинного підприємства, що отримувало їх як "прибуток", а згодом до НБУ. Однак це були відмиті кошти, у тому числі Кошти Позивача, і вони не були "доходом", отриманим в обмін на продаж пального, або результатом будь-якої іншої законної операції, а НБУ та його посадові особи були зобов'язані повернути виведені та відмиті кошти назад Позивачу.

99.     Після того, як Курченко придбав 80.0273% акцій БрокБанку в 2013 році, Курченко, працюючи за погодженням та знанням та згодою НБУ, здійснював дії щодо привласнення коштів БрокБанку та ПриватБанку, що включали Кошти Позивача, що в підсумку призвело до неплатоспроможності БрокБанку та подальшої його ліквідації.

100.    Посадові особи НБУ були співучасниками неправомірної схеми для перенаправлення, виведення та інших видів неправомірного переказу коштів з БрокБанку в НБУ та на користь третіх осіб, у тому числі Злочинного підприємства. Окрім того, що НБУ